UNITED STATES, Appellee,

v.

Michael L. OHRT, Staff Sergeant, U.S.
Air Force, Appellant.

No. 60,467.
ACM S27616.

U.S. Court of Military Appeals.

June 26, 1989.

For Appellant: *Major Frank J. Spinner* (argued); *Colonel Richard F. O'Hair* (on brief).

For Appellee: *Major Kathryn I. Taylor* (argued); *Colonel Joe R. Lamport* and *Lieutenant Colonel Robert E. Giovagnoni* (on brief); *Major Kingston E. Smith,* USAFR, and *Captain Marc Van Nuys.*

*Opinion of the Court*

COX, Judge:

Appellant, an Air Force staff sergeant with more than 12 years of good service—in both the Army and the Air Force—was tried by a special court-martial with members for one charge and specification alleging wrongful use of marijuana on or about March 7, 1987, in violation of Article 112a, Uniform Code of Military Justice, 10 USC § 912a. In accordance with his guilty pleas, he was convicted and sentenced to be reduced in rank to pay grade E–2 and to be discharged with a bad-conduct discharge.

He filed a timely appeal with the Court of Military Review, which considered his case *en banc.* The court was evenly divided by a four-to-four vote as to whether appellant was entitled to resentencing because of errors that allegedly occurred during the sentencing portion of his trial. 26 MJ 578 (1988).

We granted appellant's petition and have two issues before us for consideration:

I

WHETHER THE MILITARY JUDGE COMMITTED PREJUDICIAL ERROR BY OVERRULING A DEFENSE OBJECTION TO TESTIMONY GIVEN BY APPELLANT'S COMMANDER REGARDING APPELLANT'S LACK OF POTENTIAL FOR "CONTINUED SERVICE."

II

WHETHER ARTICLE 66(c), UCMJ 10 USC § 866(c), MANDATES THAT THE COURT OF MILITARY REVIEW SET ASIDE A SENTENCE WHERE NO MAJORITY OF THE COURT FINDS IT CORRECT IN LAW.

We will deal with the second issue first. In *United States v. Peurifoy,* 22 USCMA 549, 550 n.4, 48 CMR 34, 35 n.4 (1973), *overruled on other grounds, United States v. Kozak,* 12 MJ 389, 393–94 (CMA 1982), we recognized by *dicta* that an "evenly divided vote result[s] in affirmance of" a lower court decision. This comports with the general rule regarding appellate practice. *See* 5 Am Jur 2d, *Appeal and Error* § 902 (1962). We are mindful that the United States Coast Guard Court of Military Review recently held, in a well-reasoned opinion, that this general rule is not applicable to Courts of Military Review.

*United States v. Beckermann,* 25 MJ 870 (1988), *aff'd on other grounds,* 27 MJ 334, 335 (CMA 1989).

■■■ We now hold that if a Court of Military Review is evenly divided on a *question of law,* the general rule applies. Recognizing the unique power of these courts to "weigh the evidence, judge the credibility of witnesses, and determine controverted questions of fact," [1] we do not at this time opine whether an evenly-divided vote concerning such questions of fact or questions of appropriateness of sentence would or should lead to the same result. In any event, it has long been recognized that questions of admissibility of evidence are questions of law, albeit most evidentiary rulings involve mixed questions of law and fact. Art. 51(b), UCMJ, 10 USC § 851(b). *See United States v. Hoyos,* 868 F.2d 1131, 1135 (9th Cir.1989). An evenly divided vote on a question of admissibility of evidence affirms the ruling below.

The other granted issue gives us an opportunity to consider once again important questions regarding sentencing by courts-martial. RCM 1001(b)(5) permits *"[e]vidence of rehabilitative potential,"* as follows:

> The trial counsel may present, by testimony or oral deposition in accordance with R.C.M. 702(g)(1), evidence, in the form of opinions concerning the accused's previous performance as a servicemember and potential for rehabilitation. On cross-examination, inquiry is allowable into relevant and specific instances of conduct.

Manual for Courts–Martial, United States, 1984.

In *United States v. Horner,* 22 MJ 294 (CMA 1986), we attempted to make it clear that opinion testimony offered under this rule was intended to address the accused's "character and potential." We made it clear that, under this Manual provision, testimony based upon "the commander's view of the severity of the offense.... is

simply not helpful to the sentencing authority." *Id.* at 296.

We likewise note that both the Army and the Air Force Courts of Military Review have had the opportunity to apply the rule. In our view, both courts have been on target with their application and construction of the rule. *See United States v. Susee,* 25 MJ 538 (ACMR 1987); *United States v. Beno,* 24 MJ 771 (AFCMR 1987), *pet. denied,* 26 MJ 57 (1988).

However, the case, *sub judice,* demonstrates that there are several important issues left to develop. For example:

1. Who would be considered an appropriate witness to express an opinion concerning the accused's "rehabilitative potential"?

2. What foundation must be laid before the witness may express an opinion?

3. What is the scope of the opinion?

■■■ To answer the first question, it is clear that some prosecutors view this rule as a license to bring a commanding officer before a court-martial preemptively to *influence* the court members into returning a particular sentence. It is most apparent that trial counsel are urging adjudication of a punitive discharge. Such witnesses have no place in court-martial proceedings. This is the converse of situations where witnesses who would speak favorably for the accused are influenced not to appear. *See United States v. Levite,* 25 MJ 334 (CMA 1987); *United States v. Thomas,* 22 MJ 388 (CMA 1986), *cert. denied,* 479 U.S. 1085, 107 S.Ct. 1289, 94 L.Ed.2d 146 (1987); *United States v. Brice,* 19 MJ 170 (CMA 1985).

The only appropriate witness is one who can be helpful to the court-martial when it acts in making "the determination of a fact in issue." Mil.R.Evid. 701, Manual, *supra; United States v. Susee,* 25 MJ at 540. Thus, the foundation to be laid becomes most important.

■■■ Mil.R.Evid. 701 governs admissibility of lay-opinion testimony, and it applies to evaluative statements offered un-

---

1. Art. 66(c), Uniform Code of Military Justice, 10 USC § 866(c).

der RCM 1001(b)(5). *United States v. Susee*, 25 MJ at 540. Only "opinions ... which are ... rationally based on the perception of the witness and ... helpful to a clear understanding of the testimony of the witness o[r] the determination of a fact in issue" are admissible. Mil.R.Evid. 701. Thus, a foundation must be laid to demonstrate that the witness does possess sufficient information and knowledge about the accused—his character, his performance of duty as a servicemember, his moral fiber, and his determination to be rehabilitated— to give a "rationally based" opinion. Of course, as in all cases, this requirement can be waived or agreed upon by the opposing party.

■ In *United States v. Horner, supra,* we tried to make it clear that "rehabilitative potential" refers to the accused. It is based upon an "assessment of ... [the accused's] character and potential." 22 MJ at 296. Thus, a witness whose opinion is based upon factors other than an assessment of the accused's service performance, character, and potential does not possess a rational basis for expressing an opinion.

This view of the definition of "rehabilitative potential" is consistent with the Air Force policy regarding sentenced servicemembers. Paragraph 7–2, Air Force Regulation (AFR) 125–18 (C3, February 17, 1988), provides:

> Air Force policy is to restore to duty prisoner[s] who are thought physically, mentally, or morally qualified to become useful members of the Air Force.

An earlier "MISSION" statement found in Air Force Pamphlet 125–8 (December 3, 1976), entitled Security Police, THE USAF CENTRALIZED CORRECTIONS AND REHABILITATION PROGRAMS, states:

> The Correction and Rehabilitation Group (CRG) offers selected Air Force personnel the opportunity to receive specialized treatment and training to return them to duty or civilian life *improved in attitude, conduct, and efficiency, and with the ability to perform productively.*

(Emphasis added.) That mission is now charged to the 3320th Correction and Reha-

bilitation Squadron. AFR 125–18 (C3, February 17, 1988), Chapter 8, entitled OPERATION AND ADMINISTRATION OF THE 3320TH CORRECTION AND REHABILITATION SQUADRON (CRS).

Simply stated, the opinion envisioned by RCM 1001(b)(5) can only be expressed by a witness who has a rational basis for his conclusions, founded upon the accused's service performance and character.

This leads us to the scope of the opinion testimony, which is what creates the vexing paradox evidenced by the divided vote of the Court of Military Review. The paradox is this:

a. We should only retain those people in service who have rehabilitative potential.

b. Thus, if a member does not have rehabilitative potential, he should not be retained.

c. If he should not be retained, he should be discharged.

d. If you ask a witness, "Does the accused have rehabilitative potential?"; He will answer, "No, he should be discharged."

Judge Murdock, speaking for four members of the Court of Military Review, suggested that the question of retention in service and rehabilitation are so inextricably related to the authorized punishment of a punitive discharge that it is difficult, if not impossible, to separate the two concepts: *i.e.,* "rehabilitation potential" and "retention in the service." He said:

> Testimony about retention merely recognizes that discharges are authorized punishments for certain offenses under the code and that information about this sentence component could reasonably assist the sentencing authority in determining an appropriate sentence.

26 MJ at 582. Although the logic of Judge Murdock's view is sound, we nevertheless reject it. We do so for two fundamental reasons.

■ The first reason is the fact that a witness—be he for the prosecution or the

defense—should not be allowed to express an opinion whether an accused should be punitively discharged. The question of appropriateness of punishment is one which must be decided by the court-martial; it cannot be usurped by a witness. Thus, for the same reasons that we do not permit an opinion of guilt or innocence, or of "truthfulness" or "untruthfulness" of witnesses, we do not allow opinions as to appropriate sentences. *See United States v. Azure*, 801 F.2d 336 (8th Cir.1986); *United States v. Arruza*, 26 MJ 234, 239 (CMA 1988) (Sullivan, J., concurring in the result), *cert. denied*, —— U.S. ——, 109 S.Ct.1120, 103 L.Ed.2d 183 (1989). The use of euphemisms, such as "No potential for continued service"; "He should be separated"; or the like are just other ways of saying, "Give the accused a punitive discharge." A court-martial has no other discharge available to it.

The second reason—and perhaps the more important one—is that it misplaces the role of the *punitive* discharge in the military justice sentence model.[2]

We agree with the dissenting view expressed by Judge Lewis that "a court-martial sentencing proceeding differs from an administrative discharge hearing." 26 MJ at 586. The sentencing authority must focus on the question of what is the appropriate punishment.

**2.** We recognize that court members and military judges, especially in close cases, will give great weight to the "rehabilitative potential" of an accused in trying to decide whether to impose a punitive discharge. However, that harmonizes with the general purposes of a military sentence, that is: What will enhance good order and discipline within the military community?

**3.** The most recent statement of sentence considerations can be found in the Sentencing Reform Act of 1984, Pub.L.No. 98–473, 98 Stat.1989 (October 12, 1984):

(a) **Factors to be considered in imposing a sentence.**—The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider—
(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

■ The reasons for sentences in the military are well-illustrated by a proposed instruction for military judges:

Our society recognizes five principal reasons for the sentence of those who violate the law. They are:

1. Protection of society from the wrongdoer.

2. Punishment of the wrongdoer.

3. Rehabilitation of the wrongdoer.

4. Preservation of good order and discipline in the military.

5. The deterrence of the wrongdoer and those who know of his/her crime and his/her sentence from committing the same or similar offenses.

Vowell, *To Determine an Appropriate Sentence: Sentencing in the Military Justice System*, 114 Mil.L.Rev. 87, 88 n. 5 (1986), *quoting* para. 2–59, Department of Army Pamphlet 27–9, *Military Judges Benchbook* (C1, Feb. 15, 1985).[3]

In order to achieve these general sentencing goals, military verdicts traditionally, at least from the time of the Roman Legions, have consisted of several components designed to achieve the desired effect on the force:

1. Reduction in Rank.

2. Deprivation of Pay.

(2) the need for the sentence imposed—
(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
(3) the kinds of sentences available;
&ast; &ast; &ast; &ast; &ast; &ast;
(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.
18 USC § 3553.

3. Disgrace and humiliation.

4. Corporal Punishment such as flogging, maiming, branding.

5. Death.

C. Brand, *Roman Military Law* 104–05 (Univ. of Texas Press, Austin & London, 1968).

In more recent times, restrictions on freedom have come into vogue, such as imprisonment, arrest in quarters or restriction, together with "hard labor." Article 55, UCMJ, 10 USC § 855, eliminated corporal "[p]unishment by flogging, or by branding, marking, or tattooing on the body, or any other cruel or unusual punishment." But the punitive discharge has survived. As one commentator noted:

> The punitive discharge was never intended to be a rehabilitative punishment. Historically the punitive discharge came into being at a time when retribution and deterrence were the chief, if not the only, reasons for inflicting punishment. The punitive discharge was designed to sever a servicemember from the military community and to put a mark upon him which would make it difficult for him to reenter the civilian society and economy. The punitive discharge thus had two effects by design: first, it punished by ejection from a familiar society and by imposing social and economic hardships; and, second, it deterred others by its visible, swift, effective and harsh character.

Lance, *A Criminal Punitive Discharge—An Effective Punishment?*, 79 Mil.L.Rev. 1, 17 (1978).

■■■ The punitive discharge is a stigma. It is a badge of dishonor, and it has a significant historical background and basis. Importantly, it can be adjudged with or without regard to whether an accused has rehabilitative potential. As Judge Sullivan described in *United States v. Cruz*, 25 MJ 326, 330 (CMA 1987), one of the long-recognized forms of punishment for military offenders was the discharge under conditions of dishonor and ignominy. Colonel Winthrop defines such a discharge as follows:

> *Discharge with ignominy.* A mode of dishonorable discharge, sanctioned by usage for time of war, is *drumming*, (or bugling,) *out of the service*, with the "Rogue's March," in the presence of the command.

W. Winthrop, *Military Law and Precedents* 434 (2d ed. 1920 Reprint) (footnotes omitted). Colonel Winthrop described the dishonorable discharge as "correspond[ing] to dismissal in the case of an officer, in that it expels the offender with disgrace from the army...." *Id.* at 433.[4]

■■■ Given this historical background, we conclude that RCM 1001(b)(5) was not designed to give the prosecutor an opportunity to influence court members to punish the accused by imposing a punitive discharge. It also was not intended to be a vehicle to make an administrative decision about whether an accused should be retained or separated.

■■■ It is with this concept regarding the role of the punitive discharge in a court-martial sentence that we view the opinion testimony elicited in this case and the military judge's ruling. Specifically, our attention is on the relevance and admissibility of the testimony of Major David C. Rauhecker, who was the commander of the 834th Component Repair Squadron, the

---

**4.** Indeed, the origin of the punitive discharge can be traced at least to the Roman Empire. One author has observed:

> *Disgrace (ignominia).* The dishonorable discharge (*missio ignominiosa*) was the primary form of this variety of punishment for an individual. An organization was disgraced by the issue of barley rations instead of wheat, and by being required to encamp outside the fortifications. Under this category numerous marks of disgrace were inflicted upon offenders, as the fancy and ingenuity of the commander might dictate. Frontinus, Suetonius and Valerius Maximus mention dozens of such indignities. The centurion required by Augustus to stand all day before the general's tent holding a clod in his hands, officers and soldiers forbidden to eat or drink in public, or required to take their meals standing, or condemned to stand barefoot in public places are fair examples.

C. Brand, *Roman Military Law* 104–05 (Univ. of Texas Press, Austin & London, 1968) (footnotes omitted).

command to which appellant was assigned. Major Rauhecker's testimony was offered by the Government for the purpose of "elicit[ing] an opinion with respect to the accused's rehabilitation potential." He was asked the following question:

Sir, based upon everything that you know, do you have an opinion as to Staff Sergeant Ohrt's potential for continued service in the United States Air Force?

Over defense objection, he responded: "I believe he does not have potential."

A member of the court-martial then asked Major Rauhecker, without objection, a question which was paraphrased by the military judge and developed the following testimony:

MJ:—The question is, was, as I understand it, was Sergeant Ohrt offered Article 15 punishment. Is that the question?

[Court Member]: Yes, it is.

\*    \*    \*    \*    \*    \*

[Maj Rauhecker] A: No, he was not.

[Court Member]: May I ask why?

MJ: Go ahead.

[Maj Rauhecker] A: As commander, my viewpoint on the use of illegal drugs is that it's not—there's not a place for it in the—in the military, and I have a hardfast briefing that I give to every person in my squadron. When I took command I gave it to the entire squadron at a mandatory formation, and subsequent to that I've give[n] it to every individual assigned to my squadron. It's if you're allegedly involved with the use of drugs and found to be guilty that I would have no more use for your services in my command.

Returning to the facts of the instant case, we conclude that, when placed in the

perspective of his policy regarding members of his command found guilty of drug use, Major Rauhecker's testimony was inadmissible. It lacked a proper foundation to demonstrate that the Major's opinion was personalized and based upon the accused's character and potential; rather, it was a view that appropriate punishment for drug users included a punitive discharge.[5] We are unable to determine from the record before us whether admission of this evidence unfairly influenced the court members; therefore, we cannot conclude that it was harmless.[6]

The decision of the United States Air Force Court of Military Review as to sentence is reversed. The sentence is set aside. The record of trial is returned to the Judge Advocate General of the Air Force. A rehearing on sentence may be ordered.

Chief Judge EVERETT concurs.

SULLIVAN, Judge (concurring in part and dissenting in part):

I agree that a divided vote at the Court of Military Review affirms the findings and sentence approved below. However, I disagree with my Brothers that a proper foundation was not established for Major Rauhecker's testimony. The record of trial, including the finding of the judge, support my conclusion that the commander's opinion of appellant's potential for rehabilitation was not based solely on the offense for which the latter was convicted. Accordingly, it was admissible under the decision of this Court in *United States v. Horner*, 22 MJ 294 (CMA 1986).

The record of trial states:

Q: And, sir, have you had an opportunity to review the Unit Personnel Record

---

5. *See* Art. 4, UCMJ, 10 USC § 804, which gives a dismissed officer the right to demand trial by court-martial; otherwise, only an administrative discharge may issue.

6. In fairness to the witness, he was not allowed to lay a foundation upon which to base his opinion. The record lends itself to two constructions: (a) that his opinion was based solely on his personal views of drug offenders; and (b) that his opinion was based upon his review of the accused's personnel record and alcohol abuse problems. Military judges should always require that a foundation for the witness' opinion be laid either *in camera* [Art. 39(a), UCMJ, 10 USC § 839(a)] or by offer of proof (Mil.R. Evid. 103).

Group of Staff Sergeant Ohrt prior to today?

A: I have.

Q: And have you reviewed the squadron information file on Sergeant Ohrt prior to today?

A: Yes, I have.

Q: Sir, are you aware that—

IDC: Your Honor, I object to counsel bringing in matters that are not in evidence. There is no such squadron file in evidence.

MJ: Well, I'm not aware that he's intending to put it in evidence. I assume that counsel's trying to lay a foundation. Are you saying, defense counsel, you're satisfied with the foundation for the opinion which I assume counsel wants to elicit?

IDC: I don't know what opinion counsel is trying to elicit, Your Honor.

MJ: Trial counsel, are you going to try to elicit an opinion with respect to the accused's rehabilitation potential?

TC: Yes, Your Honor.

MJ: Is there an objection from the defense to foundation based—

IDC: No objection for that.

MJ: Since there is no objection, why don't you just press on quickly here to the guts of the testimony?

TC: Thank you, sir.

Q: Major Rauhecker, are you aware that Staff Sergeant Ohrt has been found guilty of the charge of illegal use of marijuana?

A: Yes, I am.

\* \* \* \* \* \*

Q: Sir, based on everything that you know, do you have an opinion as to Staff Sergeant Ohrt's potential for continued service in the United States Air Force?

A: Yes, I do.

Q: And what is that opinion, sir?

A: I believe he does not have potential.

\* \* \* \* \* \*

[Cross–Examination]

Q: Alright. Did you review this man's work record and his APRs?

A: Yes, I have.

Q: And what—what did those indicate?

A: A good performance.

Q: Okay. He has no prior Article 15s?

A: He has a mixed background, both in the Army and the Air Force. In the Air Force, to my knowledge, he does not.

Q: In the Air Force, he has none, right?

A: To the best of my knowledge.

Q: Well, to the best of your knowledge, according to your records, he has none, right?

A: That's correct.

Q: Now, you feel he has no further value in your particular specialty?

A: That's correct.

Q: Alright, what about other areas in the Air Force with his—with his past record, with his—with his abilities? Are you—are you telling this court he has no place whatsoever in the Air Force?

A: That's correct.

Q: And that's your personal opinion.

A: That's correct.

Q: And that's based upon your view as a commander?

A: Yes.

\* \* \* \* \* \*

[After a question by a court member, the following occurred:]

MJ: The question is, was, as I understand it, was Staff Sergeant Ohrt offered Article 15 punishment. Is that the question?

CAPT GOBELL: Yes, it is.

MJ: Is there any objection?

IDC: I have no objection.

MJ: Okay, you can answer that.

A: No, he was not.

CAPT GOBELL: May I ask why?

MJ: Go ahead.

A: As commander, my viewpoint on the use of illegal drugs is that it's not—there's not a place for it in the—in the military, and I have a hardfast briefing

that I give to every person in my squadron. When I took command I gave it to the entire squadron at a mandatory formation, and subsequent to that I've given it to every individual assigned to my squadron. It's if you're allegedly involved with the use of drugs and found to be guilty that I would have no more use for your services in my command.

CAPT GOBELL: Thank you.

MJ: Are there any other questions from the members?

(Negative response from each member.)

\* \* \* \* \* \*

[Recross-examination]

Q: Major, let me ask you this. Is your opinion of rehabilitative potential based solely upon the fact that—of Sergeant Ohrt's drug use?

A: And previous alcohol abuse.

Q: And previous alcohol abuse. That's what your opinion is based upon?

A: That's correct.

IDC: Your Honor, I would—I would move—I would move to strike his testimony, and I think based upon a man, a complete man, the full record, it's clearly obvious it's based strictly upon this offense.

MJ: Well, of course, your initial cross-examination did a good job of demonstrating otherwise. Your objection is overruled and your motion is denied. Is there any other question to Major Rauhecker?

TC: No, Your Honor.