UNITED STATES, Appellee,

v.

**Wendy A. KIRK, Airman Basic, U.S. Air Force, Appellant.**

No. 62,736.
ACM S27869.

U.S. Court of Military Appeals.

Argued Feb. 13, 1990.
Decided Sept. 20, 1990.

For Appellant: *Captain Ronald A. Gregory* (argued); *Colonel Richard F. O'Hair* (on brief); *Major Conrad C. Baldwin,* USAFR, and *Captain Laurence M. Soybel.*

For Appellee: *Major Paul H. Blackwell* (argued); *Colonel Joe R. Lamport* and *Major Terry M. Petrie* (on brief); *Captain Joseph V. Treanor III.*

## Opinion of the Court

SULLIVAN, Judge:

On May 24, 1988, appellant was tried by a special court-martial composed of officer members at Lackland Air Force Base, Texas. Pursuant to her pleas, she was found guilty of missing movement through design and violating a lawful general regulation "by developing a personal relationship with" her instructor, in contravention of Articles 87 and 92, Uniform Code of Military Justice, 10 USC §§ 887 and 892, respectively. She was sentenced to a bad-conduct discharge. The Court of Military Review affirmed the findings and sentence in an unpublished opinion dated January 31, 1989.

This Court granted review of the following four issues of law on October 4, 1989:

### I

WHETHER THE MILITARY JUDGE ERRED BY PERMITTING APPELLANT'S COMMANDER, MAJOR BALL, TO TESTIFY THAT IN HIS OPINION APPELLANT LACKS REHABILITATION POTENTIAL, WHERE HIS OPINION WAS BASED SOLELY ON THE OFFENSES TO WHICH APPELLANT PLED GUILTY.

### II

WHETHER APPELLANT'S PLEAS OF GUILTY TO CHARGE III AND ITS SPECIFICATION WERE IMPROVIDENT BECAUSE THE PROVIDENCY INQUIRY WAS INCOMPLETE.

### III

WHETHER APPELLANT WAS A STUDENT WITHIN THE MEANING OF ATC REGULATION 30-4 WHICH PROHIBITED PERSONAL RELATIONSHIPS BETWEEN STUDENTS AND INSTRUCTORS.

### IV

WHETHER THE REVIEWING SJA ERRED BY FAILING TO PROVIDE THE ADDENDUM TO THE SJA REVIEW TO THE TRIAL DEFENSE COUNSEL FOR COMMENTS ON NEW MATTERS RAISED WITHIN THE ADDENDUM.

We affirm the findings of guilty in this case but set aside the sentence because of the military judge's prejudicial error in allowing Major Ball's sentencing testimony. *See generally United States v. Cherry,* 31 MJ 1 (CMA 1990); *United States v. Ohrt,* 28 MJ 301, 307 (CMA 1989).

The record of trial reflects the following testimony for the prosecution from the commander of appellant's student squadron:

Q. You are Major Jesse W. Ball Jr.?

A. Yes, I am.

Q. The commander of the 3295th Student Squadron, is that correct?

A. That's right.

Q. Here at Lackland Air Force Base, is that right?

A. That's correct.

Q. How long have you had that assignment?

A. I've been commander of the 3295th Student Squadron for ten months now.

Q. And, where were you before that?

A. I was commander of the 3291st School Squadron here.

Q. Could you explain the difference between those two units?

A. Okay. The 3291st School Squadron was under a different setup, whereas I had both permanent party personnel instructors and students. Under the student group setup my squadron is made up primarily of students who were in training.

Q. So, for ten months you've been the commander of that squadron?

A. Right.

Q. What about the other squadron? How many months were you the commander of that squadron?

A. Approximately one year.

Q. How long have you been on station at Lackland?

A. Approximately twenty-one months.

Q. How long have you been in the Air Force?

A. Sixteen years.

Q. What's the mission of your unit, the 3295th Student Squadron?

A. The primary mission of my unit is to—the responsibility for health, morale and welfare of the student population of my squadron and to support, which is in direct support of the training mission.

Q. So you kind of go hand-in-hand with the training function?

A. That's correct.

Q. *Approximately, if you know, how many students are assigned to your squadron?*

A. *Approximately two hundred.*

Q. *Do you know the accused in this case?*

A. *Yes, I do.*

Q. *If she's present, would you point to her and state her name.*

A. *(Pointing at the accused) It's, uh, uh, Airman uh—I've got so many. Uh, what's her name?*

Q. *Are you drawing another blank today?*

A. *Yes. Airman uh—I can't even remember her name.*

Q. *Can you read her name tag from there?*

A. *Yes.*

(Major Ball rose from his seat and leaned over toward the accused who leaned forward and framed her name tag with her fingers.)

A. *Oh boy. I can't even see it without my glasses.*

Q. *Is that Airman Kirk?*

A. *Airman Kirk. I'm sorry. Airman Kirk.*

Q. Sometimes you have a lot of blanks, so, don't worry about it. How do you know Airman Kirk?

A. Airman Kirk became assigned to my squadron back in, I would say, approximately three to four months ago, and she came to me from the 3292nd Student Squadron.

Q. Are you the accuser in this case?

A. Yes, I am.

Q. So, you preferred court-martial charges in this case?

A. Yes, I did.

Q. What did you do before you preferred charges in this case?

A. Well, I reviewed her collateral training folder. We keep what we call a collateral training folder in the squadron in which we will gather counseling forms from the tech training community, and also we will keep counseling forms that are generated by my squadron, and also other data pertaining to the individual.

Q. And you say you reviewed that file?

A. Yes, I did.

Q. And is there any other information that you took into account before you preferred charges?

A. The only thing that I probably took under consideration was that she had previous counseling, but other than that, nothing else.

Q. *So had you spoken with—I'm assuming you weren't her instructor, is that correct?*

A. *No, I wasn't.*

Q. Did you talk to her instructor or team chief or student training advisers?

A. Well, I had talked to her—Of course, I talked to her STAs on a consistent basis

because they are assigned to me, and I had previously, about a month to forty-five days prior, talked to instructors about Airman Kirk.

Q. Before you preferred charges, did you actually talk to her?

A. Yes, I did.

Q. How many times did you talk to her?

A. Twice.

Q. Can you give us a rough idea of when that occurred?

A. Well, the first occasion, as I said, was roughly thirty to forty-five days prior to the last incident, and then I talked to her a day or so after the last incident.

Q. So, on that occasion—There's a stipulation of fact in evidence that says that you took a statement from her and that she represented certain things. Is that the occasion you're talking about?

A. Yes.

Q. About when she returned and you took a statement?

A. The last time I talked to her.

Q. How often do you talk to the average airman in your squadron?

A. Well, I talk to each airman during my incoming briefings, and then I talk to—and this is en masse, of course—and then I talk to each airman at least once a month, after they are assigned to me, at Commander's Call. Now, as far as face-to-face and one-on-one, it depends on whether or not there's a need for them to talk to me, and if it has to be for a specific purpose, or the airman may want to talk to me about anything because I do have an open-door policy.

Q. *So, to clarify for the members, one-on-one, how many conversations have you had with the accused?*

A. *Two.*

Q. Has the Air Base Group Defense Course always been at Ft Dix, New Jersey, or where has it been?

A. No, prior to—It was moved to Ft Dix approximately ten months ago, and prior to that, it was at—let's see. Where was it. It was at—

Q. Is that here at Camp Bullis?

A. Camp Bullis, right.

Q. And, so, you became commander of the squadron just about the time—

A. About the same time.

Q. —Air Base Group training moved to Ft Dix?

A. That's correct.

Q. Since that time since you became commander, how many students in the squadron have missed the flight to Ft Dix as Airman Kirk did?

A. On their own volition, none.

Q. Qualify that or explain what you mean by "their own volition."

A. In other words, just arbitrarily not making the troop movement without permission or direction.

Q. So, there are other reasons that she could have missed it?

A. Yes, there are on occasions a need to not allow an airman to make the troop movement for disciplinary infractions just prior to movement or for medical reasons or any reason, like I say, for cause.

Q. But, as far as the number of airmen who have missed the flight to Fort Dix by design, what is that number again?

A. Zero.

\*   \*   \*   \*   \*   \*

Q. What kind of impact would it have on your squadron if the accused is retained in the Air Force?

A. Well, in my opinion, it would have a negative impact. Again, in my opinion, it would probably create perceptions in the minds of other students that you can commit a serious offense or infraction of the UCMJ and get punished and remain in the Air Force, and, of course, that would probably cause an increase in disciplinary infractions.

Q. *Do you think that the accused has a potential for future service in the Air Force?*

A. *No, I don't.*

Q. *Why not?*

A. *Well, in my opinion, these infractions are a total disregard for military standards. It shows a lack of adapta-*

*bility to the military, total disregard for rules and regulations, and it shows that she just is not willing to adhere to the rules and regulations of the Air Force, and I think it would be, you know, a waste of Air Force resources to retain her.*

Q. One other question just in your defense. Have you testified at other courts this week, at other courts-martial?

A. Yes, I have.

MJ Capt Madsen, what relevancy does that have?

TC: I just wanted to point out the confusion he may have had in identifying the accused. Thank you. No further questions.

MJ Capt Middleton.

### CROSS–EXAMINATION

Questions by the defense counsel:

Q. Maj Ball, at one point you suggested that if Airman Kirk was retained in the Air Force it would have some type of negative impact on your squadron, is that correct?

A. Yes.

Q. She's not coming back to your squadron, isn't that correct?

A. That's true. If she were not going to her assignments, no.

Q. But, she, is, isn't she, or she was? Isn't that right?

A. Well, she was proceeding on to another assignment. Yes, she was.

Q. There never was any question of her coming back to your squadron, isn't that correct?

A. I suppose so, yes.

Q. So, there really hasn't been any negative impact on your squadron, and there wouldn't be, would there?

A. If she didn't come back there probably wouldn't be a negative impact.

Q. Well, let's look at the facts. She wasn't coming back, was she?

MJ: He answered your question, Capt Middleton.

Q. So, there hasn't been any negative impact, is that correct?

A. There hasn't been?

Q. That's the question.

A. Well, I haven't—I can't really say because I have not looked into it that deeply to find out.

Q. You expressed some opinions on her rehabilitative potential. Those are just your opinions, isn't that correct?

A. That's correct.

Q. And the other individuals that she worked for might differ, isn't that correct?

A. That's true.

(Emphasis added.)

### Issue I

■ In *United States v. Horner*, 22 MJ 294 (CMA 1986), this Court held that RCM 1001(b)(5), Manual for Courts–Martial, United States, 1984, requires that an admissible opinion on rehabilitative potential be based on an individual assessment of a servicemember's character and potential. In *United States v. Ohrt*, 28 MJ 301, 304 (CMA 1989), this Court said that it must be shown that a commander expressing such an opinion "does possess sufficient information and knowledge about the accused—his character, his performance of duty as a servicemember, his moral fiber, and his determination to be rehabilitated—to give a 'rationally based' opinion." *See United States v. Antonitis*, 29 MJ 217, 220 (CMA 1989); *United States v. Gunter*, 29 MJ 140 (CMA 1989). The Government concedes that the record of trial fails to establish such a foundation of personal knowledge of appellant for Major Ball, and we agree.

■ In *Horner* and its progeny, this Court also said that an opinion on rehabilitative potential based solely on the severity of the offenses was not helpful to a court-martial within the meaning of Mil.R.Evid. 701, Manual, *supra*, because it provides no rational insight into an individual's personal circumstances. *See United States v. Antonitis*, *supra* at 220; *United States v. Gunter*, *supra* at 141–42; *United States v. Ohrt*, *supra* at 307. Here Major Ball's testimony was clearly based on his inflexi-

ble view of the grave nature of appellant's infractions. Accordingly, his opinion testimony was not authorized under RCM 1001(b)(5) for this reason, as well. *See United States v. Cherry, supra.*

█ Finally, *United States v. Horner, supra* at 296, and *United States v. Ohrt, supra* at 305, indicate that a commander as a sentencing witness cannot recommend a particular sentence to a court-martial or employ euphemisms in his testimony which ineluctably lead to the same result. Here, the commander testified, "I think it would be, you know, a waste of Air Force resources to retain her." This language rationally conveys the commander's opinion that appellant should be separated, which is an impermissible comment under *United States v. Ohrt, supra. See United States v. Cherry, supra.*

█ Appellate government counsel argues that no prejudice inured to appellant as a result of this inadmissible sentencing testimony from the commander. He particularly states that appellant failed to object to this testimony at trial. *See* Mil.R.Evid. 103(a)(1).

This case, we note, was tried in between the decisions of this Court in *United States v. Horner* and *United States v. Ohrt,* both *supra.* This Court has found waiver in such a case where there was no objection to the scope of the opinion testimony of the commander. *See United States v. Wilson,* 31 MJ 91 (CMA 1990). Nevertheless, the multiple grounds for finding this evidence inadmissible in this case and their egregious nature suggest plain error. *See* Mil. R.Evid. 103(d). We simply cannot accept government counsel's characterization of this failure to object as "a brilliant tactical maneuver." There is no indication in the record that counsel deliberately withheld his objection at trial with a view towards securing a reversal on appeal and an order prohibiting a rehearing.

In addition, we are not convinced by the Government that the record of trial establishes that this opinion testimony played no role in the awarding of a punitive discharge to appellant. Ample evidence of good potential for rehabilitation was submitted by the defense, yet it was ultimately rejected by the members. Moreover, a commander's testimony, even that with the obvious foundational problems of Major Ball, is deserving of some weight with the members. *See generally* H. Moyer, *Justice and the Military* § 2–658 (1972). Accordingly, the error was prejudicial, so the sentence must be set aside. *See United States v. Cherry, supra.*

## Issues II and III

█ Appellant also attacks her guilty pleas on several grounds. She first asserts that the providence inquiry was inadequate because she was not specifically asked whether her commander gave her permission to date her instructor. *See* para. 4c, Air Training Command Regulation 30–4, Professional Conduct and Relationships (Aug. 30, 1984).[1] The military judge, however, read the pertinent parts of this regulation, including the language-"[e]xcept when authorized by their commander"-to appellant, and she admitted violating that regulation. This is sufficient. *See United States v. Chambers,* 12 MJ 443, 444 (CMA 1982).

1. c. *Students.* Except when authorized by their commander, no student personnel will directly or indirectly, personally or through other persons:

   *    *    *    *    *    *

(5) Attempt to develop a personal relationship with any faculty or staff member. Specifically, students will not:

(a) Make sexual advances toward, seek or accept advances from faculty or staff members, and will avoid the appearance of such conduct.

(b) Date any faculty or staff member assigned or attached to the same installation.

(c) Use rank or position, threats, pressure, or promise of return favors or favorable treatment in an attempt to gain sexual favors from faculty or staff members, and will avoid the appearance of such conduct. NOTE: Does not preclude participation in Air Force approved fund drives, membership campaigns, etc., gifts of nominal value, or loaning equipment or supplies when such actions are not done for personal gain.

Also she asserts for the first time that she was not a student for purposes of this regulation. This belated contention we also must reject. *See* para. 3b(1), ATC Reg. 30–4.[2] *See also United States v. Harrison*, 26 MJ 474 (CMA 1988).

### Issue IV

■ Appellant's final contention is that she was denied the right to respond to new matters raised by the staff judge advocate in his addendum to his initial post-trial recommendation in this case. *See generally United States v. Narine*, 14 MJ 55 (CMA 1982). These matters pertain to an appropriate punishment which should be approved by the convening authority in this case. Since we will set aside the sentence in this case because of the evidentiary error, this question is moot.

The decision of the United States Air Force Court of Military Review is reversed as to sentence. The sentence is set aside. The record of trial is returned to the Judge Advocate General of the Air Force. A rehearing on sentence may be ordered.

Chief Judge EVERETT and Judge COX concur.

---

**2.** b. *Students.* This term as it applies in this regulation includes:

(1) All DOD personnel and international students, either military or civilian, who are assigned or TDY to Air Training Command bases, centers, or wings in one of the following categories:

(a) Awaiting training or course entry.

(b) Attending training or education programs.

(c) Completed, eliminated, or disenrolled from training and awaiting reassignment.

(2) All officer candidates in precommissioning programs and applicants for entry into the Air Force.