# UNITED STATES NAVY-MARINE CORPS
# COURT OF CRIMINAL APPEALS
# WASHINGTON, D.C.

**Before**
**J.A. FISCHER, D.C. KING, T.P. BELSKY**
Appellate Military Judges

**UNITED STATES OF AMERICA**

v.

**WILLIAM M. LEFEVERS**
**CORPORAL (E-4), U.S. MARINE CORPS**

**NMCCA 201400312**
**GENERAL COURT-MARTIAL**

**Sentence Adjudged:** 15 April 2014.
**Military Judge:** LtCol C.J. Thielemann, USMC.
**Convening Authority:** Commanding General, 1st Marine Division (REIN), Camp Pendleton, CA.
**Staff Judge Advocate's Recommendation:** Maj V.G. Laratta, USMC.
**For Appellant:** Maj Jeffrey Stephens, USMCR.
**For Appellee:** LCDR Catheryne E. Pully, JAGC, USN; Capt Matthew M. Harris, USMC.

**18 June 2015**

---------------------------------------------------------
**OPINION OF THE COURT**
---------------------------------------------------------

THIS OPINION DOES NOT SERVE AS BINDING PRECEDENT, BUT MAY BE CITED AS PERSUASIVE AUTHORITY UNDER NMCCA RULE OF PRACTICE AND PROCEDURE 18.2.

KING, Judge

Pursuant to his pleas, a military judge convicted the appellant of one specification of making a false official statement, one specification of aggravated assault, and one specification of child endangerment, in violation of Articles 107, 128, and 134, Uniform of Military Justice, 10 U.S.C. §§

907, 928, and 934.  The adjudged sentence included thirty months' confinement, reduction to pay grade E-1, and a bad-conduct discharge.  The convening authority (CA) approved the sentence as adjudged.  However, pursuant to the pretrial agreement, the CA suspended all confinement in excess of twenty-four months and agreed to waive automatic forfeitures for six months provided the appellant establish an allotment for his wife.

On appeal, the appellant alleges that his sentence is excessively severe.  After careful examination of the record of trial and the pleadings of the parties, we disagree.  The findings and sentence are correct in law and fact, and we find no error materially prejudicial to the substantial rights of the appellant.  Arts. 59(a) and 66(c), UCMJ.

## Background

The appellant enlisted in the Marine Corps in 2007 at the age of 19.  His first deployment to Afghanistan came in September 2010 and lasted until April 2011, where he served as a machine gunner.  During this deployment the appellant engaged in "hundreds" of firefights with the enemy.

After this deployment, the appellant began exhibiting symptoms of post-traumatic stress disorder (PTSD).  The appellant nonetheless deployed to Afghanistan for a second time from 24 February 2012 until 9 September 2012, during which the appellant's unit was required to medically evacuate countless wounded civilian Afghan children who fell victim to improvised explosive devices.  Moreover, the appellant's unit engaged in several firefights, including a six-hour battle with the Taliban, where the appellant displayed exceptional courage, skill, and leadership.

After returning from this deployment in September 2012, the appellant's PTSD symptoms worsened, resulting in his chain of command cancelling his orders for a third deployment to Afghanistan so that they could "keep an eye on him."[1]  His leaders "talked to him multiple, multiple times about going to talk to somebody about seeking treatment, telling him that it was okay[, but the appellant] brushed it off, said, yes, he will; never did.  We did everything we could besides force him to go to treatment, which is something that we can't do to

_____

[1] Record at 123.

2

anyone, and that would just be counterproductive if we could anyway."[2]

On the morning of 21 January 2013, the appellant was caring for his two-year-old step-daughter CW while his wife, CW's mother, went to work. To help him sleep, the appellant had taken Benadryl the night before and was still asleep when his wife left for work between 0400 and 0500 that morning. What happened next is detailed best in the appellant's stipulation of fact:

> I was awoken by [CW], my step-daughter. I was so angry that I grabbed [CW] by the hair and threw her down the stairs and she hit the wall . . . head first and I heard a thud as her cheek and side of her head hit the wall. I remember standing with a lump of [CW's] hair in my right hand. I flushed the hair down the toilet in the upstairs bathroom because I didn't want to look at it. [CW] was crying really loud. I could tell that she was scared and in pain. I then went down the stairs and grabbed her by one arm . . . and carried her back up the stairs and into the master bedroom and laid her on the bed for several minutes. [CW] continued to cry for what seemed like 10-15 minutes, and I was walking around the bedroom trying to calm down. I knew she was hurt and should get medical attention, but I was worried that I would get into trouble for hurting her.[3]

The appellant then called his wife and attempted to console CW while waiting for his wife to return home. When his wife returned home, he told her that CW had accidentally fallen down the stairs.

The appellant and his wife then took CW to the hospital where CW was "whimpering and appeared to be in significant distress or pain, and she had several bruises over her face, some on her body, and . . . deformity of her upper right arm."[4] It was later determined that CW had a "twisted-type" fracture of

---

[2] *Id.*

[3] Prosecution Exhibit 1.

[4] Record at 89.

her humerus, commonly caused by "grabbing somebody and pulling upward."[5]

Based upon these injuries, hospital staff suspected that CW had been abused, and contacted the Naval Criminal Investigative Service (NCIS). While the appellant was still at the hospital, a special agent from NCIS questioned him about CW's injuries. After being informed of his rights pursuant to Article 31(b), UCMJ, the appellant initially told the special agent that CW had accidentally fallen down the stairs. However, several minutes later, during the same period of questioning, the appellant admitted to pushing CW down the stairs. CW was then airlifted to a Children's Trauma Center where she was treated.

Prior to trial in this case, and in response to a joint motion from trial and defense counsel, the military judge ordered that the appellant undergo a competency evaluation pursuant to RULE FOR COURTS-MARTIAL 706, MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.). The report from this evaluation indicated that at the time of the incident in question, the appellant's PTSD constituted a severe mental disease or defect, but concluded that this disease or defect did not affect the appellant's competency or rise to the level of a defense to the appellant's conduct. Subsequently, the appellant entered into a pretrial agreement with the CA, pleading guilty to the charges set forth above. At a subsequent Article 39(a), UCMJ, session, during which the appellant pleaded guilty to the offenses, the appellant confirmed that, at the time he committed these offenses, and despite the PTSD diagnosis, he knew what he was doing and could have controlled his conduct if he had wanted to.[6] When asked if he was responsible for his actions despite his PTSD, the appellant replied "absolutely, sir."[7] After sentencing the appellant, the military judge informed him that he likely would have awarded a dishonorable discharge and a greater amount of confinement were it not for "the significant contributions you paid to our country."[8]

---

[5] *Id.* at 92.

[6] *Id.* at 32.

[7] *Id.* at 33.

[8] *Id.* at 155.

4

**Sentence Severity**

The appellant now argues that his sentence to a bad-conduct discharge and confinement for 30 months was inappropriately severe given the evidence of his good military character and the fact that he suffered from PTSD caused by his combat deployments. We disagree.

In accordance with Article 66(c), UCMJ, this court "may affirm only such findings of guilty and the sentence or such part or amount of the sentence, as it finds correct in law and fact and determines, on the basis of the entire record, should be approved." Sentence appropriateness involves the judicial function of assuring that justice is done and that the accused gets the punishment he deserves, *United States v. Healy*, 26 M.J. 394, 395 (C.M.A. 1988), which requires "individualized consideration of the particular accused on the basis of the nature and seriousness of the offense and character of the offender," *United States v. Snelling*, 14 M.J. 267, 268 (C.M.A. 1982) (internal quotation marks and citation omitted).

We have reviewed the entire record and we are mindful that prior to this incident the appellant exhibited many of the qualities we would expect of an outstanding Marine: effective and courageous in combat, focused on the welfare of those in his charge, and intent upon continuing to serve his country. We also recognize that service-connected PTSD may have played a role in generating the anger that he admits led to his misconduct. Finally, the record reveals that the appellant is truly remorseful for his misconduct and eventually took responsibility for his actions, both before the military judge and the CA.

Still, we cannot ignore that his victim was a two-year-old child who relied upon him for care and protection, nor that his vicious actions injured that child and placed her life in peril. Moreover, the appellant's misconduct was far more than simply reactive. Instead, after taking the time to remove the child's hair from his hands, he very likely exacerbated her injuries by yanking her up the stairs where he let her lie in pain for several minutes instead of taking her to the hospital because he was "worried that [he] would get in trouble." Finally, hours later, when asked for the truth, the appellant lied. When we consider the brutality of the initial assault, the danger in which it placed its young victim, and the protracted misconduct in which the appellant engaged to evade responsibility, we are not persuaded that the sentence was inappropriate.

5

## Conclusion

While the appellant's service to his country and the onerous consequences that service may impose upon him may certainly cry for clemency, we are not authorized to provide it. *Id.* Therefore, the findings and sentence are affirmed.

Senior Judge FISCHER concurs.

BELSKY, Judge (dissenting in part):

This case falls square on the ill-defined edge of the jurisprudential line dividing this court's affirmative duty under Article 66(c), UCMJ, to affirm only so much of a sentence that "should be approved," *see* Article 66(c), UCMJ, and the prohibition against awarding clemency, which is solely the province of the convening authority. *United States v. Healy*, 26 M.J. 394, 395 (C.M.A. 1988). The majority reasons that affirming anything less than the approved sentence in this case would constitute clemency. However, I find that the unique facts of this case, when viewed in consideration with the distinctive purpose of the punitive discharge in the military justice system, require the court under Article 66(c), UCMJ, to set aside the appellant's bad-conduct discharge. For this reason, I respectfully dissent.

## Factual Background

In addition to the facts set out in the "Background" portion of the majority's opinion, the record of trial also reveals that until the moment of the instant offenses the appellant was an exemplary Marine. He rated a 4.8 multiple times on his Proficiency/Conduct marks, including his most recent occasion before the instant offenses, and he had no history of disciplinary problems while on active duty. Additionally, there was no indication of any personal problems or a history of violence in the appellant's background before the instant offenses. By all accounts, the appellant was "very professional, respectful, [and] motivated," and "wore the uniform with a lot of pride." Record at 129.

After returning in 2011 from his initial deployment to Afghanistan, the appellant was described as a "train wreck," and fellow servicemembers noticed that his experience during deployment was "eating him up really bad." *Id.* at 134. Upon return from his second deployment in September 2012, the appellant began to exhibit significant symptoms of post-

6

traumatic stress disorder (PTSD).  The appellant had trouble sleeping, and often could not even fall asleep without taking either prescription sleep aides or over the counter medicines such as Benadryl.  The appellant's wife also testified that she would sometimes find the appellant at night by himself crying in the corner of the couple's garage because he "lost a lot of buddies" on deployment.  *Id.* at 111.  Less than six months after returning from this second deployment, the appellant committed the instant offenses.

The seriousness of the appellant's PTSD, and the degree to which it contributed to his conduct, were significant questions for the investigating officer (IO) during the appellant's Article 32, UCMJ, investigation.  In his report, the IO stated that he had "reason to believe [the appellant] lacked mental responsibility for certain charged offenses," but concluded that he had insufficient evidence to determine whether this would constitute a defense at court-martial.  Investigating Officer's Report of 6 Sep 2013 at 3, 5.  Evidence from the appellant's medical records offered during the Article 32, UCMJ, proceeding documented that the appellant suffered from flashbacks, night terrors, and sleep walking.  *Id.* at 4.  The appellant also felt "overwhelmed with debilitating anxiety," and would often wake up "agitated and 'flipping out' not recognizing his surroundings." *Id.*

Prior to trial, and in response to a joint motion from trial and defense counsel, the military judge ordered that the appellant undergo a competency evaluation pursuant to Rule for Courts-Martial 706, Manual for Courts-Martial, United States (2012 ed.). The report from this evaluation indicated that at the time of the incident in question, the appellant's combat induced PTSD constituted a severe mental disease or defect, but concluded that this disease or defect did not affect the appellant's competency or rise to the level of a defense to the appellant's conduct.  Subsequently, the appellant pled guilty to each of the charges on the charge sheet.

**Sentence Severity**

The majority's opinion aptly sets out the applicable law this Court must follow when it is asked to decide the appropriateness of a sentence in a given case.  I only add that the act of determining an appropriate sentence under Article 66(c), UCMJ, is an objective function of justice based on the facts contained in the "entire record," rather than a subjective act of mercy or compassion that can be based on any reason or no

reason.  *See United States v. Beatty*, 64 M.J. 456, 458 n.4 (C.A.A.F. 2007); *United States v. Key*, 71 M.J. 566,573 (N.M.Ct.Crim.App. 2012). In light of this precedent directing our review, three things in the appellant's case objectively compel me to conclude that setting aside the punitive discharge is the appropriate judicial function under Article 66(c), UCMJ.

First, there is no doubt that, at the time of the instant offenses, the appellant suffered from severe combat-induced PTSD.  Indeed, this condition was so extreme that the appellant's superiors pulled his orders for a third deployment to Afghanistan due to their concern for his mental well-being, and a military psychiatrist classified his condition as a "severe mental disease or defect" under R.C.M. 706.  Appellate Exhibit XV at 2.  These facts demonstrate the unusually severe nature of the appellant's condition.

Second, the record of trial reveals that, prior to the instant offenses, the appellant did not have *any* history of disciplinary problems or questionable behavior.  The appellant, in his five years of military service, did not have even the slightest disciplinary infraction in his record – not a single incident of a nonjudicial punishment or adverse counseling notation.  To the contrary, he was essentially a "5.0" Marine up until the instant offenses, who repeatedly served courageously in combat and earned the respect of his fellow Marines. Additionally, CW's mother testified at the presentencing proceeding that, prior to the offenses of conviction, the appellant was "great" with CW, *see* Record at 101, and the appellant even referred to CW as his own daughter, *id.* at 124. The appellant's pristine history of military service and good behavior prior to the instant offenses leads to the inescapable conclusion that his severe PTSD significantly contributed to the appellant's reaction to CW waking him.  Indeed, it is not a stretch, given this unique record of trial, to conclude that the appellant would not have committed the instant offenses *but for* his suffering from PTSD.  This fact weighs heavily in my analysis under Article 66(c), UCMJ.

Finally, examination of the history and purpose of the punitive discharge convinces me that, under Article 66(c), UCMJ, this type of punishment is not appropriate in this case.  Having no counterpart in the civilian criminal justice system, the punitive discharge serves a unique penological purpose in military justice.  "Historically the punitive discharge came into being at a time when retribution and deterrence were the chief, if not the only, reasons for inflicting punishment."

8

*United States v. Ohrt*, 28 M.J. 301, 306 (C.M.A. 1989). Unlike the traditional criminal punishments available to a sentencing authority, the punitive discharge was unique in that it was intended as an excommunication of the offender with disgrace in the eyes of his fellow servicemembers and the general public; a special stigma for an individual who engaged in disgraceful behavior while wearing the uniform of a United States servicemember. *Id.* (quoting Colonel Winthrop's explanation of the punitive discharge as the "drumming (or bugling,) out of the service, with the 'Rogue's March,' in the presence of the command."). "The punitive discharge thus had two effects by design: first, it punished by ejection from a familiar society and by imposing social and economic hardships; and, second, it deterred others by its visible, swift, effective and harsh character." *Id.* In light of this unique history and purpose of the punitive discharge, as well as the availability of other forms of punishment for a convicted servicemember, it follows that there are certain circumstances, rare as they may be, when an offender's objectively criminal conduct does not warrant the stigma of a punitive discharge. The appellant's case presents one of those rare circumstances.

In the appellant's case, it is doubtful that a punitive discharge would serve either the purpose of retribution or deterrence, given the unique character of this case. For one thing, given that the appellant's conduct was extremely influenced by his PTSD, and occurred under conditions unlikely to re-occur, it is reasonable to conclude that the stigma of a conviction and a period of confinement serve as sufficient retribution for the appellant's conduct. Furthermore, I can see no way in which a punitive discharge (any more than the other punishments meted out in this case) will deter others from engaging in similar acts given the specific circumstances that motivated the appellant's conduct. In light of these reasons, I find a punitive discharge inappropriately severe under Article 66(c), UCMJ.

Indeed, the punitive discharge is especially cruel in this case as it would deprive the appellant access to much needed veteran treatment services to address his extreme combat-inducted mental illness, which lay at the root of his conduct.[9]

---

[9] *See* 38 U.S.C. § 101(2)(defining an eligible veteran to be a person who served in the active military and who was not discharged under conditions other than dishonorable); 38 C.F.R. § 3.12(c)(2)(precluding benefits where the former servicemember was discharged by reason of the sentence of a general court-martial).

In my opinion, there is something fundamentally unsettling to punish a servicemember in such a way so as to deprive him of needed medical care for a combat-induced mental health disorder, when that punishment is based on conduct that was significantly influenced by the disorder in the first instance, and from which the servicemember would not have suffered *but for* his military service.[10]  In light of all these reasons, I find the punitive discharge inappropriately severe.

In concluding, I note that I do not ignore or minimize the abhorrent nature of the appellant's conduct and the suffering he caused a most innocent of victim in this case, as well as his efforts to deceive investigators about his actions.  However, I am obligated under Article 66(c), UCMJ, to consider not only the nature and seriousness of offenses committed but also the individual characteristics of the offender.  *United States v. Snelling,* 14 M.J. 267, 268 (C.M.A. 1982).  After closely considering all aspects of this case, I find under Article 66(c), UCMJ, that the reduction in rank and the period of confinement are the only punishments that should be affirmed.  Accordingly, I would affirm the findings and so much of the sentence as provides for thirty months' confinement and reduction to pay grade E-1.

For the Court

R.H. TROIDL
Clerk of Court

---

[10]  To be sure, this Court has previously held that an appellant's service in combat, which resulted in PTSD, justified setting aside a punitive discharge under Article 66(c), UCMJ.  *See United States v. Gober*, No. 201100632, 2012 CCA LEXIS 759 at *4-5, unpublished op. (N.M.Ct.Crim.App. 29 Mar 2012); *United States v. Smith II*, No. 200900239, 2009 CCA LEXIS 558 at *4, unpublished op. (N.M.Ct.Crim.App. 17 Dec 2009).  While I note that the offenses in these cases (unauthorized absence, orders violations, and drug use) were not as violent as the appellant's conduct in this case, the logic of these cases still remains – that an appellant's service in combat, and ensuing mental health disorders, are relevant in determining sentence appropriateness under Article 66(c), UCMJ, especially when the record of trial demonstrates, as it does in this appellant's case, that those mental health concerns significantly contributed to the criminal conduct in question.

10