UNITED STATES, Appellee,

v.

**Rodney L. BROWN, Seaman Recruit, U.S. Navy, Appellant.**

No. 60637.
NMCM 87 4296.

U.S. Court of Military Appeals.

Sept. 8, 1989.

For Appellant: *Major Joseph B. Gilbert, USMC* (argued); *Captain Bradley G. Pollack, USMCR* (on brief).

For Appellee: *Lieutenant Commander L. Friedman, JAGC, USN* (argued); *Captain Wendell A. Kjos, JAGC, USN* and *Lieutenant Rick D. Bastien, JAGC, USNR* (on brief).

*Opinion of the Court*

SULLIVAN, Judge:

On October 23, 1987, appellant was tried by military judge sitting alone as a special court-martial at Naval Station, San Diego, California. Pursuant to his pleas, he was found guilty of two specifications of unauthorized absence, in violation of Article 86, Uniform Code of Military Justice, 10 USC § 886. He was sentenced to a bad-conduct discharge, confinement for 60 days, and forfeiture of $400.00 pay per month for 2 months. The convening authority ap-

proved the sentence as adjudged. The Court of Military Review affirmed the findings and sentence in an unpublished opinion dated June 17, 1988.

This Court granted review of the following issue:

WHETHER THE MILITARY JUDGE ERRED BY ADMITTING INTO EVIDENCE TESTIMONY WHICH WAS HEARSAY, WHICH PERTAINED TO MATTERS ABOUT WHICH THE WITNESS HAD NO PERSONAL KNOWLEDGE, AND WHICH ALLEGED UNCHARGED MISCONDUCT.

We hold that admission of the challenged evidence for the different purposes articulated by trial counsel during trial and in his closing argument on sentence was prejudicial error. *See generally United States v. Kinman,* 25 MJ 99 (CMA 1987).

The facts of this case are not in dispute. Appellant was on unauthorized absence twice for a total of 113 days. He pleaded guilty to these offenses before a military judge sitting alone as a special court-martial. For the purpose of sentencing, government counsel presented the testimony of Operations Specialist Chief Surface Warfare Michael Miller. The following testimony was elicited:

[TC] Q. What is your opinion for his potential for future service in the United States Navy?

A. I don't think at the present time, with the problems that I've had with him down there, that I would recommend [he] ride on a ship.

Q. Would you recommend him for any place in the United States Navy?

A. No, sir. It would take too much time for petty officers to supervise him.

Q. What would [you] say about his military bearing?

A. Somewhat worse than I normally have down there. Most of my people I've got down there on Legal Hold that I've got most problems with is personnel inspections, maintaining clean uniforms.

Q. What's your opinion on his reliability?

A. As long as I can keep him on the job site, it wouldn't be too bad, sir.

Q. But you have problems keeping him on the job site?

A. Yes, sir, we periodically had to go try and find him, see where he had wandered off to.

DC: Objection, sir, uncharged misconduct.

TC: No further questions at this time.

MJ: Overruled. Cross-examination?

DC: Yes, sir.

## CROSS–EXAMINATION

By the defense:

Q. Chief, pretty much of your opinion as to rehabilitative potential is based upon these offenses, is that correct?

A. Yes, sir.

Q. In fact, all of it's based on that, is it not?

A. Yes, sir, that's where I've had my majority of problems with him.

Q. The offenses that he's charged with here today?

A. Um-hmm.

Q. Okay. Now, as far as direct observation of Seaman Recruit Brown, you haven't had any have you? I mean as far as like watching, seeing him on a daily basis.

A. Observing what's going on within the building, yes, sir.

Q. So, you've observed him daily?

A. On periodic occasions, yes, sir. I have to wander around and make sure the work is being done within my building. And I observe my work crews that my petty officers have working out there.

Q. So, you haven't actually seen him refuse to do work, have you?

A. No, sir. I've never actually seen him refuse, no.

Q. Pretty much your opinion is based upon what others have told you, isn't that true?

A. My leading petty officer, yes, sir.

Q. So your opinion is based on what his leading petty officer has told you, correct?

A. Um-hmm.

Q. Okay. All of your testimony is based on what your leading petty officer has told you?

A. No, sir, not all of it. The personnel inspections I conduct myself.

Q. So it's based upon personnel inspections that you've conducted and—

A. My observance—

Q. What your leading petty officer—

A. And what my leading petty officer has told me, yes, sir.

Q. That's it, those two things?

A. No, sir, I also observe what's going on within my building because I have to check on it so I can let my lieutenant know.

Q. But you've never actually observed him refuse to do work, correct?

A. That is correct, sir, but I've also observed him when other people are working he's just standing around talking with the other students, not doing the work he was assigned to do.

Q. Now you're saying that you've observed him not doing work?

A. I have observed him, yes, sir. That's what I said in the beginning.

DC: No further questions.

MJ: Redirect?

TC: Yes, sir.

REDIRECT EXAMINATION

By the prosecution:

Q. Defense counsel asked you a question in the beginning of his cross, whether or not the UAs were the only disciplinary problems the accused has been in. Isn't it true there have been some other problems with the accused?

DC: Again, he's asking for uncharged misconduct. I'd object to that question.

TC: Your Honor, defense counsel attempted to test the basis of the opinion and I believe that has opened the door into other incidents.

MJ: Overruled. You may answer the question, Chief.

Q. Isn't it true there have been some other problems with the accused other than just the UAs?

A. Yes, sir. We had one problem where one of the female students in the class that he was in previous to coming to me had lent him her car to have it repaired. The word came back to the command that that car was in a new car dealership lot. It had been traded in by Seaman Recruit Brown to use as a down payment on a new car.

DC: Objection, Your Honor. Is this based upon—I don't believe it is based upon personal observance, but hearsay.

WIT: No, sir, that was based upon the report from NIS.

DC: Excuse me, that's not a question to you, sir.

MJ: Your objection is what, counsel?

DC: Object that first of all it's uncharged misconduct, second of all hearsay.

MJ: Overruled.

TC: Go ahead and finish.

A. The police were the ones who recovered the vehicle. They called the Collection Unit downtown, Naval Training Center and told us where Seaman Recruit Brown was located at that time.

Q. So in other words the accused used somebody else's car as a trade in for a car he purchased?

A. Yes.

Q. Is there any other instances the accused has been involved in?

A. We had one minor altercation in one of my passageways there between him and one other sailor I had working in "X" Division at the time.

Q. Could you tell the court what took place in that altercation?

A. Seaman Recruit Rangel, Seaman Recruit Brown and a couple of other people had been trying to strip and wax the deck down by the lab areas. And Rangel had said something to Brown to the effect that he was not doing his work. He was just standing around. Words started going back and forth between the two of them. Something was said concerning Rangel's mother, hoping that she was out on the street and pregnant. And that's when Rangel who had a hot temper to begin with got up and told him to come over and talk to him about that. The witness reports that I took from the class that was standing out there at the time said that Seaman Recruit Brown got up at that time with the idea to come and attack him or something. Rangel decked him unfortunately. Rangel came into our office and told us what had happened, that he had hit Seaman—

DC: Objection, sir. This is all hearsay.

MJ: Counsel?

TC: Your Honor, I believe it's reliable hearsay. The chief conducted a personal investigation of the incident, and questioning many of the students who saw the incident.

MJ: Objection sustained.

TC: No further questions, Your Honor.

The granted issue does not particularly identify the evidence now challenged on appeal. However, the appellate briefs clearly indicate that it is Chief Miller's testimony that appellant unlawfully disposed of a female student's car. The basis for the chief's assertion of this purported fact was a report from the Naval Investigative Service (NIS). Defense counsel objected at trial and asserted that this testimony was not based on personal observation; it was inadmissible hearsay and it contained evidence of uncharged misconduct.

■ The first question we will address is whether Chief Miller should have been permitted to testify about what the police report said concerning appellant's commission of a prior bad act. He clearly had personal knowledge of the report as required by Mil.R.Evid. 602, Manual for Courts-Martial, United States, 1984.[1] Yet, such testimony was hearsay if it was offered to prove the truth of the matters asserted in the report, *i.e.*, appellant's prior misconduct. *See* Mil.R.Evid. 801(c). Absent an applicable exception (Mil.R.Evid. 803 and 804), introduction of this evidence of the report to show appellant committed another act of misconduct violated the rule against hearsay. Mil.R.Evid. 802.

Of course, trial counsel maintained that this testimony from Chief Miller was only offered to show the particular basis for the latter's opinion that appellant had poor rehabilitation potential. *See* RCM 1001(b)(5), Manual, *supra*. *See generally* Mil.R.Evid. 701 and 705. He asserted this testimony was a direct response to defense counsel's cross-examination suggesting that Chief Miller based his opinion only on his knowledge of the charged offenses. *See United States v. Wingart*, 27 MJ 128, 133–34 (CMA 1988); *United States v. Horner*, 22 MJ 294, 296 (CMA 1986). He claimed the

1. Mil.R.Evid. 602 states, *inter-alia:* "A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has *personal knowledge of the matter*." (Emphasis added.) Chief Miller had no personal knowledge of this incident since his

information was derived second hand from a police report. He was simply not a competent witness to testify in his own right to the purported commission of this act of misconduct by appellant. Mil.R.Evid. 601; *see United States v. McGill*, 15 MJ 242 (CMA 1983).

challenged testimony would show the Chief's opinion was based on knowledge of an additional matter (*i.e.*, the report) which further indicated appellant's poor character and potential. RCM 1001(d); *cf. United States v. Pearce*, 27 MJ 121 (CMA 1988). In this light, it could be argued that the challenged testimony was not offered to show this other misconduct occurred but that a report made available to Chief Miller stated such misconduct had occurred.

A proffer of such proof for this limited purpose might avoid the prohibition against hearsay provided in Mil.R.Evid. 802. *See United States v. Ohrt*, 28 MJ 301, 307 (CMA 1989) (Sullivan, J., concurring in part and dissenting in part). *Cf.* Analysis to Mil.R.Evid. 801(d), Example (1), Manual, *supra* at A22–43. Yet, we have grave doubts whether admission of evidence of the specific misconduct in the NIS Report would pass muster under RCM 1001(b)(5) and the decision of this Court in *United States v. Wingart, supra* at 133–34. Assuming it did, an obvious Mil.R.Evid. 403 problem would then be created requiring the judge to walk a fine line. On the one hand, he could consider this testimony to support Chief Miller's opinion that appellant had poor potential for future naval service. On the other hand, he could not directly consider this testimony to show appellant was a bad man with little chance for rehabilitation. *Cf.* RCM 1001(f)(2)(A).

■ Trial counsel himself failed to preserve this distinction and further compounded the potential for undue prejudice in this case. *Cf. United States v. Pearce, supra* at 124–25. In his closing argument, trial counsel said:

As far as the aggravation evidence is concerned, Your Honor, I think Chief Miller has painted the picture of an indi-

vidual who does not have a great deal of potential for future service. He's been somewhat of a disciplinary problem over there. They've had problems getting him into work. We don't know the status of this charge involving the car, the civilian charges. *We don't even know if there are still civilian charges, but obviously there seems to be something wrong in that area.*

*We also heard some testimony that he got into a fight with an individual while he was under Chief Miller's care. All the evidence seems to picture an individual who does not have potential for future service.* Therefore, the government believes that a BCD is entirely warranted in this case. As far as confinement is concerned, he's been UA approximately 115 days.

(Emphasis added.) Not only did he use the challenged evidence to attempt to directly increase appellant's sentence but he also improperly argued that evidence of other misconduct, whose admission had been expressly rejected by the judge, could be used for the same purpose. Absent some affirmative statement from the judge rejecting counsel's overtures,[2] we conclude that the possibility of prejudice in this context is too great for us to ignore. *See United States v. Kinman, supra* at 100. Clearly, appellant had little, if any, chance of avoiding a discharge if the uncharged misconduct was considered by the judge.[3]

The decision of the United States Navy–Marine Corps Court of Military Review is reversed as to sentence. The record of trial is returned to the Judge Advocate General of the Navy for remand to that court for reassessment of the sentence.

Chief Judge EVERETT concurs.

---

**2.** Trial counsel's conduct in this regard is inexplicable. Moreover, defense counsel did not expressly renew his earlier successful objection to the evidence of appellant's purported fight with his coworker. He simply characterized these matters as "innuendo."

**3.** Consideration of the information would not be barred in federal civilian criminal courts where sentencing is the exclusive function of

the trial judge. 18 USC § 3661. Moreover, it may be considered under the new federal sentencing guidelines. *See* 28 USC § 994(d)(10). However, until these guidelines are made applicable to courts-martial and the sentencing power resides in the military judge alone, adherence to the more restrictive Manual provisions is required.

COX, Judge (dissenting):

I respectfully dissent. In *United States v. Ohrt*, 28 MJ 301 (CMA 1989), and *United States v. Horner*, 22 MJ 294 (CMA 1986), we attempted to make it abundantly clear that RCM 1001(b)(5), Manual for Courts-Martial, United States, 1984, allows a witness who has a **basis for his conclusion** to express an opinion about whether an accused has "rehabilitative potential." Some persons who have committed less-serious offenses can indeed be "rehabilitated" and made into good servicemembers; others cannot.

If the basis for a witness' opinion is challenged by the opposing party on cross-examination, then the witness is permitted to present the premise for his position on the record. RCM 1001(b)(5) was designed to allow such action without fouling the record with uncharged misconduct. When a witness' conclusions are challenged by an opponent, the door is opened wide to admit the fundamental premises of those conclusions, including the good, bad, and indifferent, if such information is relevant.

In *Ohrt*, the opining witness was an Air Force major. The officer's premise for his opinion regarding the accused's rehabilitative potential was the fact that:

(a) He had reviewed Ohrt's fitness reports; and,

(b) He was aware of some unspecified *hearsay* evidence concerning alcohol abuse.

Here, the opining witness was a Navy chief petty officer. The noncommissioned officer based his judgment about appellant's rehabilitative potential on the fact that:

(1) He had personally observed the accused on a daily basis;

(2) He had personally investigated one episode of uncharged misconduct involving accused;

(3) He had personal knowledge of the contents of a Naval Investigative Service (NIS) report involving this accused and the attempted larceny of a female student's car; and

(4) He had personal knowledge of the two AWOL offenses for which the accused was being sentenced.

Quite frankly, I have never seen a witness who was more qualified to express an opinion under RCM 1001(b)(5) than was this chief petty officer.

I must assume that both my Brothers agree that the noncommissioned officer based his conclusions about this accused's potential for rehabilitation on factors which became relevant when his position was attacked by defense counsel during cross-examination. Whether the witness' opinion was based on hearsay is irrelevant. Trial defense counsel is obliged to contest the validity of a witness' opinion if it is founded on *untrue* hearsay. Here, the witness' testimony went totally unchallenged by the defense.

The majority opinion, nonetheless, goes on to reverse this case because "admission of the challenged evidence for the different purposes articulated by trial counsel during trial and in his closing argument on sentence was prejudicial error." 28 MJ at 471. I have already stated my views on this subject in *United States v. Kinman*, 25 MJ 99, 102 (CMA 1987); however, this case is an extreme application of the rule established there. Even if I agreed with my Brothers that the evidence here may have been considered by the military judge for some other purpose than to determine if the accused had "rehabilitative potential," the error would be harmless beyond a reasonable doubt, in my judgment.

It is my opinion that Congress most certainly did not intend for this Court to reverse convictions because harmless errors were made during trial proceedings. Art. 59(a), Uniform Code of Military Justice, 10 USC § 859(a).

The sentence adjudged by this military judge is a standard—if not "guideline"— one used for Navy personnel who jump ship. I am confident that if trial counsel had waived argument, the sentence would have been the same. The sentence was found "appropriate" by the United States Navy–Marine Corps Court of Military Re-

view, and I share that conclusion. I would affirm appellant's sentence.