UNITED STATES, Appellee,

v.

Melissa A. CORRAINE, Specialist, U.S. Army, Appellant.

No. 63,144
CMA 8802350.

U.S. Court of Military Appeals.

Argued May 10, 1990.
Decided Sept. 20, 1990.

For Appellant: *Captain Patricia D. White* (argued); *Colonel Robert B. Kirby* and *Captain Paula C. Juba* (on brief); *Captain Brian D. Bailey.*

For Appellee: *Captain Randy V. Cargill* (argued); *Colonel Alfred F. Arquilla* and *Lieutenant Colonel Daniel J. Dell'Orto* (on brief); *Major Gary L. Hausken.*

*Opinion of the Court*

SULLIVAN, Judge:

Appellant was tried by a military judge sitting alone as a general court-martial at Kaiserslautern, Federal Republic of Germany, on October 18, 1988. Pursuant to her pleas, she was found guilty of using marijuana and three specifications of distributing marijuana in the hashish form, in violation of Article 112a, Uniform Code of Military Justice, 10 USC § 912a. The military judge sentenced her to a dishonorable discharge, confinement for 5 years, total forfeitures, and reduction to E-1. In accordance with a pretrial agreement, the convening authority approved the adjudged sentence except for confinement exceeding 1 year and a day. The Court of Military Review affirmed the findings and the approved sentence on June 16, 1989.

This Court granted review of the following issue of law:

WHETHER THE ARMY COURT OF MILITARY REVIEW ERRED IN RULING THAT APPELLANT HAD WAIVED ANY OBJECTION TO THE IMPROPER TESTIMONY ABOUT HER REHABILITATIVE POTENTIAL.

Assuming, arguendo, that the court below erred in finding waiver, we nonetheless affirm its decision on the basis that no error actually occurred at this judge-alone trial. *See United States v. Sanford*, 29 MJ 413, 415 (CMA 1990); *cf. United States v. Gordon*, 31 MJ 30 (CMA 1990).

Appellant was a nurse whose offenses included distribution of drugs while she was acting as a "charge of quarters." During the sentencing phase of this court-martial, the Government called one witness, First Sergeant Jerry Yates. The record shows the following:

IDC: Your Honor, if we can have an offer of proof as to, could we wait one moment—Top, could you just wait one moment please.

(1SG Yates withdrew from the courtroom.)

*If we could have an offer of proof from the Government. I've interviewed the First Sergeant and I believe—I have some idea of what he is going to say and if I'm incorrect, I would like to have an offer of proof from Captain Toole* [trial counsel].

MJ: What are you calling the First Sergeant on, duty performance?

TC: Your Honor, the First Sergeant's going to talk about how long he's known this soldier. He's also going to tell the court about the mission of his unit. He's also going to tell the court about the—what a CQ on duty should be here—should be their duties. He's also going to talk about the potential for rehabilitation of this accused, his opinion.

IDC: *Your Honor, I have no objection to his saying what a CQ does, or what the mission of the unit is. I believe he'll testify that in his opinion it doesn't matter what a soldier's prior performance has been, it doesn't mat-ter what a soldier's potential for rehabilitation is. Any soldier who is convicted of this offense should be expelled from the Army.*

TC: Once again, Your Honor, that's something that Mr. Cohen could bring out on cross, if that is a fact in the case, rather than argument.

MJ: Okay. Well, we'll bring the witness in.

IDC: Yes, Your Honor.

MJ: *There's been a change of posture by the court apparently of the issue of the witness being able to testify as to the rehabilitative potential, but, I'll have to hear the testimony of the witness on that issue.*

First Sergeant Jerry W. Yates then testified as follows:

### DIRECT EXAMINATION

Questions by the prosecution:

Q. Are you First Sergeant Jerry Wayne Yates, Social Security Number 466–68–2615?

A. I am.

Q. Presently assigned to A Company, 2d General Hospital, with a place of duty at Landstuhl?

A. I am.

Q. First Sergeant, how long have you been in the Army?

A. Sixteen years, sir.

Q. And what is presently your duty relation with the accused in this case?

A. I'm Specialist Corraine's First Sergeant.

Q. How long have you known Specialist Corraine?

A. I've been her First Sergeant since January the 8th, 1988.

Q. First Sergeant, in your duties have you had an opportunity to hear or read reports on the accused?

A. Yes, I have.

Q. What is her job?

A. Ah..Specialist Corraine is a 91A, a Health Care Provider, does bedside nursing on Ward 5D, Landstuhl Army Regional Medical Center.

Q. First Sergeant, can you please explain for the court the mission of your unit?

A. The mission of my unit is a real life mission. We don't practice what we would do in a war time scenario, sir. We do what we would do in a war time scenario in that we provide health care in the largest medical center in this hemisphere, with 5 miles of hallway in that particular facility, which services an area just south of Frankfurt, all the way down to the Mediterranean, and all branches of service, Department of Defense, and State Department officials.

Our real life mission is to provide health care, in terms of technicians, to those professionals that have to do that.

Q. First Sergeant, to perform your mission what level of readiness must your unit maintain?

A. I would say 100 percent readiness at all times. That there is no particular place to work, where I or you or any other person, deserves less than 100 percent readiness in terms of providing health care for you.

Q. First Sergeant, what are the responsibilities of a person who's pulling Charge of Quarters duties in your unit?

A. Charge of Quarters, in my particular unit, which is a four level building, that houses approximately—it can house 162 soldiers, has, as it were, carte blanche in running the buildings. Their responsibilities include security, lodging; in the security, making Arms Room checks, which are on the lower level of where they are, there's an Arms Room; to do hourly, or twice hourly, or every other hour checks throughout the building; answering telephones; carrying messages; acting, as it were, CQ/Runner, from 0730 in the morning 'til 1530 hours in the afternoon. At 1530 hours, there is a Duty NCO, an E–5, that reports to duty and, therefore, assumes responsibilities for both Companies, over 2 CQ's.

Q. And what level of readiness should that person pulling CQ duties maintain?

A. They must be alert at all times just by virtue of the security and crime prevention and the mission.

Q. *First Sergeant, based on everything you know about this accused do you have an opinion as to her potential for rehabilitation?*

A. *Zero, sir.*

Q. *Do you want this accused back in your unit?*

A. *No, I do not.*

TC: Thank you. I have no further questions.

On cross-examination the record shows the following:

\*　　\*　　\*　　\*　　\*　　\*

Q. Now, you talked about your mission and the concern that the people in your unit be ready 100 percent of the time; is that correct?

A. That's correct, sir.

Q. I guess what you mean by that is off duty, as well as on duty?

A. That's correct, sir.

Q. And, of course, this is a marijuana case, so there is a concern about the intoxicating effect of marijuana; isn't that correct?

A. That's correct, sir.

Q. But, of course, at Landstuhl Army Hospital, which is the facility where you all are located and the facility that you've described to us, there is an Officer and an NCO Club; isn't that correct?

A. There is one club called "The Community Club," sir.

TC: I object, Your Honor, as to the relevance of the fact that there's an Officer's Club at Landstuhl. This is not a case involving alcohol or being drunk on duty, this is a drug distribution case.

IDC: *Your Honor, I think it's important for us to understand the First*

*Sergeant's opinions and what makes him form and reach the conclusion that he's drawn, if I may?*

MJ: *I'll allow that question.*

IDC: And, in fact, that club does serve alcohol; does it not?

A. That's correct, sir.

Q. And ah..there's no bar against doctors or against any of the members of your Company from consuming intoxicating beverages which were known as alcohol; isn't that correct?

A. Some soldiers that enrolled in Track–III programs and Drug and Alcohol Programs, there is a prohibition against them being there and consuming alcohol beverages, sir.

Q. And we all know, of course, that alcohol is an intoxicant; you would agree with that?

A. That's correct, sir.

Q. And you personally, First Sergeant Yates, you have very strong and firm positions, both about the use of alcohol and about drugs; isn't that correct?

A. That's correct, sir.

Q. And if you had it your way, you would prefer that a patient care deliverer not even be permitted to consume alcohol because of what you perceive to be the danger in their ability to perform with respect to that intoxicant; isn't that correct?

A. Yes, sir, with modifications to that statement, I agree.

Q. Okay. And, in fact, when you say that Specialist Corraine has zero potential for rehabilitation, it's your very strong and firm position that any member of your field, the health care field in the United States Army, regardless of their background, regardless of the nature of the performance in the past, and regardless of what anyone else may say about their potential for rehabilitation, as far as you're concerned there's no place for such a person in the military?

A. That's correct, sir.

On redirect examination, further responses were as follows:

\*    \*    \*    \*    \*    \*

Q. You wanted to modify your answer to the defense counsel's questions about medical personnel drinking?

A. Yes, sir.

Q. Please, go ahead.

A. This question that came across—I have nothing against a Health Care Provider having a drink; that's not against the law. It's not my position to do that, sir. To mod—to delegate that or to regulate that. I do have firm opinions about people who get drunk, and then report to duty the next day; I have concerns about that. I do run what's called a "dry Company." My moral convictions are that we don't drink at Company picnics, we don't put ourselves in those positions, nor do we enter into that, and I do have firm convictions about alcohol consumption and duty with all Health Care Providers.

Q. *How do you feel about people in your command setting up drug buys at their place of duty?*

A. *Sir, words almost escape me. In terms of the insidious nature of that happening it violates, in my opinion, a moral fabric of my Army. The moral decay that can occur secondary to that, the—the—I guess I keep going back to the insidious nature of that very act, of a soldier engaging in the illegal commerce of drugs, it is beyond question of the moral nature and of the very fiber that makes my military what it is. And anyone engaged in that cannot stand shoulder-to-shoulder with me or other soldiers in my opinion in any given time or place.*

TC: Thank you, First Sergeant.

RECROSS–EXAMINATION

Questions by the defense:

Q. *And it wouldn't matter what they—how many years of contribu-*

tion they had given to the military, or whether they were capable of being—of learning their lesson and not do it again, whether they're capable of being amenable to discipline, or whether they were capable of being educated, none of that matters to you?

A. *Not a bit, sir, when they're doing drugs.*

IDC: Thank you.

### EXAMINATION BY THE COURT–MARTIAL

· [Military Judge]

\*   \*   \*   \*   \*   \*

Q. Now, are you familiar with marijuana and the effect of it. I mean, have you read any studies or any reports?

A. Yes, sir. I've had the normal training that First Sergeants have in terms of a drug debriefing by the Drug Suppression Team. I have—when I was in Vietnam, marijuana was a very common thing to see there. I've seen, obviously, the myriad of information that's put out on television, read papers on it, the amounts of information that First Sergeants and Noncommissioned Officers are furnished in the military, regarding marijuana and other drugs, there's a great deal of it in the media.

MJ: *Well, based on what you know about marijuana, and the accused's duty perf—or her duty requirements, as well as the individuals that I just asked you about, what impact, if any, would the use of marijuana have on the ability of the accused and these individuals to perform their jobs?*

A. *I would say that it would impair their ability to perform their missions, and that my understanding and belief is that marijuana impairs*

their decision-making capabilities, their reaction time in terms of reacting to patient needs or emergencies that they would be faced with in the setting that they're operating in. Their, for lack of better words, I want to say their judgment, their insights, their abilities, their perceptional abilities would be impaired secondary to use of marijuana.

Q. Now, does your unit have any particular problem with marijuana? Are there a lot of soldiers with marijuana problems or just a few?

A. Less than a few, sir. I mean three, I just—no, we do not have a significant problem in our unit about drugs, if I'm hearing your questions correctly, sir.

(Emphasis added.)

---

■ The Court of Military Review considered the issue of admissibility of Sergeant Yates' testimony that appellant lacked rehabilitative potential. *See* RCM 1001(b)(5), Manual for Courts–Martial, United States, 1984.[1] It found that the first sergeant's opinion on this matter was solely based "on the seriousness of the offenses" for which appellant was convicted. Unpub. op. at 1. That court, however, stopped short of holding that admission of such testimony, so based, was error. We, on the other hand, do find error. *United States v. Horner*, 22 MJ 294, 296 (CMA 1986).

■ The court below nevertheless held that trial defense counsel waived his claim of legal error based on *United States v. Horner*, supra, by failing to object. *See United States v. Wilson*, 31 MJ 91 (CMA 1990). We note that this counsel did not expressly state that he objected to this testimony or formally move to strike Sergeant Yates' testimony. *See United States v. Brown*, 28 MJ 470, 474 n. 2 (CMA

---

**1.** RCM 1001(b)(5), Manual for Courts–Martial, United States, 1984, states:
*Evidence of rehabilitative potential.* The trial counsel may present, by testimony or oral deposition in accordance with R.C.M. 702(g)(1), evidence, in the form of opinions

concerning the accused's previous performance as a servicemember and potential for rehabilitation. On cross-examination, inquiry is allowable into relevant and specific instances of conduct.

1989). However, neither RCM 801(g)[2] or Mil.R.Evid. 103(a),[3] Manual, *supra*, requires such technical precision or formalism in this regard. They do, however, require substantial clarity and specificity. *See generally United States v. Means*, 24 MJ 160, 162–63 and n. 2 (CMA 1987).

In this case, defense counsel did expressly note that he was not objecting to certain testimony from Sergeant Yates which clearly implied that he was objecting to other portions of this witness' testimony. Moreover, his contemporaneous request of the prosecution for a proffer of testimony underscores his dissatisfaction with a portion of this previously-interviewed-witness' testimony. Finally, he specifically articulated the improper-basis rationale which is the cornerstone for the evidentiary exclusion holding of *United States v. Horner*, *supra*. In this context, we are reluctant to conclude that defense counsel waived appellate consideration of this issue. *See generally United States v. Partyka*, 30 MJ 242, 247 (CMA 1990); *cf. Squyres v. Hilliary*, 599 F.2d 918, 920 (10th Cir.1979).

■ Even assuming no waiver, reversal of appellant's sentence is still not required. This case was tried just over 2 years after the decision of this Court in *United States*

*v. Horner*, *supra*, which provided for exclusion of rehabilitative-potential testimony under certain circumstances. *See* RCM 1001(b)(5). Moreover, as noted above, it was tried before a military judge alone, whose attention was called to Sergeant Yates' testimony because it was improperly based on his view of the seriousness of the offense. This was the precise holding of the Court in *Horner*. In addition, the judge signaled his awareness of problems with admissibility of Sergeant Yates' rehabilitation testimony in light of recent caselaw. *Cf. United States v. Brown*, 28 MJ at 474. Finally, the judge's own questions of this witness focused on the latter's properly based view of the impact of appellant's offenses on his unit. *See* RCM 1001(b)(4);[4] *cf. United States v. Gordon*, *supra*, 31 MJ 30. In light of the above, we can presume the military judge disregarded Sergeant Yates' testimony to the extent it provided improperly based opinion testimony on appellant's rehabilitative potential. *See generally United States v. Dellarosa*, 30 MJ 255 (CMA 1990); *United States v. Vangelisti*, 30 MJ 234, 240 (CMA 1990).

The decision of the United States Army Court of Military Review is affirmed.

Chief Judge EVERETT and Judge COX concur.

---

2. *Effect of failure to raise defenses or objections.* Failure by a party to raise defenses or objections or to make requests or motions which must be made at the time set by this Manual or by the military judge under authority of this Manual, or prior to any extension thereof made by the military judge, shall constitute waiver thereof, but the military judge for good cause shown may grant relief from the waiver.

3. Rule 103. *Rulings on evidence*
(a) *Effect of erroneous ruling.* Error may not be predicated upon a ruling which admits or excludes evidence unless the ruling materially prejudices a substantial right of a party, and
(1) *Objection.* In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context; or
(2) *Offer of proof.* In case the ruling is one excluding evidence, the substance of the evidence was made known to the military judge by offer or was apparent from the context within which questions were asked.

4. RCM 1001(b)(4) states:
*Evidence in aggravation.* The trial counsel may present evidence as to any aggravating circumstances directly relating to or resulting from the offenses of which the accused has been found guilty. Except in capital cases a written or oral deposition taken in accordance with R.C.M. 702 is admissible in aggravation.

Discussion
Evidence in aggravation may include evidence of financial, social, psychological, and medical impact on or cost to any person or entity who was the victim of an offense committed by the accused and evidence of significant adverse impact on the mission, discipline, or efficiency of the command directly and immediately resulting from the accused's offense.
*See also* R.C.M. 1004 concerning aggravating circumstances in capital cases.