**UNITED STATES, Appellant,**

v.

**David A. POMPEY, Senior Airman, U.S. Air Force, Appellee.**

No. 66,187.
ACM 28219.

U.S. Court of Military Appeals.

Argued May 7, 1991.

Decided Sept. 20, 1991.

For Accused: *Captain David D. Jividen* (argued); *Lieutenant Colonel Jeffrey R. Owens* (on brief).

For the United States: *Captain Thomas E. Wand* (argued); *Lieutenant Colonel Brenda J. Hollis* (on brief).

*Opinion of the Court*

EVERETT, Senior Judge:

Pursuant to his pleas at a general court-martial, Senior Airman Pompey was convicted of a one-time use of cocaine[1] and

---

1. The single specification, preferred under Article 112a of the Uniform Code of Military Justice, 10 USC § 912a, was that Pompey "did, somewhere within the territorial limits of the

was sentenced by the court members to a bad-conduct discharge, confinement for 1 month, total forfeitures, and reduction to E–1. The convening authority approved these results. The Court of Military Review approved the findings; but, by a divided vote, that court set aside the sentence and authorized a rehearing on sentence only or a sentence of no punishment. ·32 MJ 547 (1990).

After the court *en banc* denied the Government's petition for reconsideration, the Judge Advocate General requested that this Court consider

WHETHER THE AIR FORCE COURT OF MILITARY REVIEW ERRED AS A MATTER OF LAW WHEN IT HELD THAT A PROSECUTION REBUTTAL WITNESS DID NOT POSSESS A RATIONAL BASIS FOR EXPRESSING AN OPINION OF [THE ACCUSED'S] REHABILITATION POTENTIAL, AND SET ASIDE THE SENTENCE.

I

At the outset of the sentencing proceedings, trial counsel offered in evidence Pompey's Airman Performance Reports and a stipulation of fact concerning the offense. *See* RCM 1001(b)(1) and (2), Manual for Courts–Martial, United States, 1984. Thereafter, defense counsel offered several documentary exhibits, one of which was a letter dated September 22, 1989—3 days before the trial began—and signed by appellant's supervisor, Debra H. Banker. Her letter in its entirety reads as follows:

1. I first met A1C David Pompey on 8 May when I assumed the position of secretary to the Chief of Operations, Civil Engineering. David served as the administrative specialist, and I was his supervisor. I have known him since this date.

2. My professional relationship with David was very relaxed and friendly which was possible because of David's warmth and genuiness [sic]. It was hard

not to like David. Everyone always spoke of his personal disposition in a positive manner.

3. David was excellent in his performance of duties and was always eager to perform additional duties and be of assistance. He arrived at work early and often left late in order to accomplish his work and assist others. He was extremely conscientious in his work as well as his appearance.

4. David was a member of the AU [Air University] Honor Guard Team and had a very promising career with the Air Force. *I would not hesitate to have David work for me again and feel he is certainly capable of rehabilitation.* I would like to request leniency for this young man.

(Emphasis added.) After Pompey had made an unsworn statement on his own behalf, the defense rested.

At this point, trial counsel offered rebuttal to Ms. Banker's letter. First, he introduced a form signed by Ms. Banker herself on July 24, 1989, in which she had recommended that Pompey be denied noncommissioned officer status as well as retention. She had explained thereon: "SrA Pompey does not meet the high standards required of a noncommissioned officer of the United States Air Force. Do not recommend for NCO Status or retention."

Next, he called Major Ralph Rhye as a rebuttal witness. Earlier, in a session pursuant to Article 39(a), Uniform Code of Military Justice, 10 USC § 839(a), counsel and the military judge had addressed the appropriateness of this testimony. When trial counsel had indicated his intention to use Rhye in rebuttal to Ms. Banker's letter, defense counsel had objected, citing as his basis our decisions in *United States v. Ohrt*, 28 MJ 301 (CMA 1989), and *United States v. Horner*, 22 MJ 294 (CMA 1986).

United States, between on or about 28 June 1989 to on or about 5 July 1989, wrongfully use

cocaine."

After an exchange of views between counsel, the military judge had ruled as follows:

MJ: ... but I'm also well aware [that] this whole *Ohrt* case-*Horner* case issue never came up until after 1 August 1984 with respect to the promulgation of R.C.M. 1001. And I'm also well aware, prior to that that, most certainly, if the defense offered evidence from appropriate supervisors and such that, "We believe the accused has rehabilitation potential, and we want him to come back to work for us; we would welcome him back in," the prosecution would certainly rebut by also having different supervisors come in and say, "We don't want him back." And I don't believe that the *Ohrt* and *Horner* cases dealing with M.R.E. 1001, is what we're dealing with —R.C.M. 1001, which is not what we're dealing with here now—we're dealing here now with rebuttal—was never intended as a sword to say that the government could never rebut when the defense offers evidence in that area. And I will permit the—I will permit the—

TC: Major Rhye.

MJ: —Major Rhye to testify, in rebuttal, that it would not be his desires that the accused returned to—be returned to duty to his particular organization and his opinion on rehabilitation potential. However, should we start going any further than that to get into specifics [as to the basis of his opinion], I don't really believe it is necessary.

TC: I understand, your honor.

MJ: That would be going beyond any rebuttal. So I will permit that testimony as rebuttal. Anything further?

DC: Your honor, will you allow me to go into his reason for—for stating that?

MJ: Very well, if you want to go into the—into the reasons for it, most certainly.

In due course, Major Rhye took the witness stand. He explained that he was Pompey's "military supervisor" and that he, along with three others, all were located in the same office with Pompey. He indicated that Pompey worked "between 10, 15 feet from my desk. I saw him anywhere from five, 10, 20 times a day. We dealt very closely." Shortly into Rhye's testimony, the following colloquy took place between trial counsel and the witness:

Q: ... Major Rhye, considering everything that you know about Senior Airman David Pompey, *do you feel that he has rehabilitation potential within the Civil Engineering Squadron?*

A: I do not.

Q: *Would it be your desire to have Senior Airman Pompey return to the unit and work for you in the future?*

A: No; I would not.

TC: I have no further questions.

(Emphasis added.)

As he had indicated he might do, defense counsel then sought on cross-examination to explore the basis of Rhye's opinion:

Q: Could you describe his duty performance?

A: His duty performance to this date?

Q: His duty performance as to the best of your knowledge. How has Airman Pompey been as a worker?

A: His duty performance to this date is, in my opinion, not acceptable. To this date.

Q: I'm—I'm talking about his performance of duty in the unit.

A: Well, I consider duty performance to be 24 hours a day.

Q: That's not my question. My question is how was his duty performance in the unit.

A: In the unit. For example, what I wrote on the last APR?

Q: For example, what you wrote on the last APR. How was his performance?

A: His performance, for example, on the last APR was—I would categorize as exceptional. I considered Airman Pompey to be a top five percent airman, just—there were just not enough good things we could say about him. He was a professional performer during our Mission Capability Inspection. He was an

outstanding performer during our deployment to Florida. He was on the Honor Guard. We loaned him to Gunter. The Wing Commander had nothing but praise for him. He's a super star, super troop.

Q: He's never been a disciplinary problem for you prior to this urinalysis; is that correct?

A: Never.

Q: And you really had nothing negative to say about him aside from relating to this urinalysis?

A: That's true.

Q: And, in fact, you had also considered pushing him for below-the-zone promotion prior to this; hadn't you?

A: Absolutely.

Q: Your only problem with him is the offense?

A: My problem—my problem with him is the way the offense relates to his total performance.

Q: Okay. So—but duty performance you have no problem with whatsoever? His on-the-job performance?

A: No; I don't.

On redirect, trial counsel asked Rhye to amplify somewhat:

Q: You said duty performance to date. What do you mean? Tell the court members.

A: Well, the duty perfor—when Airman Pompey's urinalysis came back positive, he no longer worked in the Operations Branch. I didn't want him around our folks. I didn't say he was guilty or not guilty, but I feel that duty performance is 24 hours a day, and you have to consider in that duty performance the things that you do on and off duty. If you take the total positive things in his duty performance 24 hours a day and the negative things, I feel that the negative things simply outweigh the positive things based upon the fact that he was a military member and held public trust and that he had a mobility commitment for worldwide deployment. So if I considered those positives and negatives in his duty performance, then I would have

to categorize to date his duty performance as unacceptable.

## II

The majority and dissenting opinions in the Court of Military Review in this case, as well as the briefs of the parties in this Court, make clear that two separate issues underlie the question that is posed to us in this case: First, does the rationale of *Ohrt* and *Horner* and their successors in a rather lengthy line of opinions from this Court (most recently, until now, *United States v. Claxton*, 32 MJ 159 (CMA 1991)) apply to the Government's case in rebuttal offered under RCM 1001(d); or is it instead limited to the opportunity of the Government in its sentencing case-in-chief to offer "[e]vidence of rehabilitative potential" under RCM 1001(b)(5)? Second, if it does apply with equal force during rebuttal, did Major Rhye's testimony run afoul of that rationale because he lacked "a rational basis for" his conclusions? *See United States v. Ohrt*, 28 MJ at 304.

### A

■ This case was tried on September 25 and 26, 1989, with the sentence proceedings on the latter date. Ironically, on September 25, this Court had published its decision in *United States v. Gunter*, 29 MJ 140 (CMA 1989), in which we applied the *Ohrt* rationale to testimony offered by the Government in rebuttal. In doing so, we sustained admission of testimony by an officer who had qualified as an expert witness in the area of drug abuse and counseling that, considering his established "knowledge of this individual," the accused's "ability to rehabilitate himself" was "[p]oor." His opinion was offered to rebut evidence that the defense had presented in various forms that indicated that the accused "was a likely candidate for rehabilitation and retention in the Air Force." *Id.* at 141.

Although in *Gunter* we did not analyze directly the issue that is squarely put to us here, surely our conclusion there was cor-

rect. The concerns that we have expressed throughout this line of cases—the need to have "a rational basis for" an opinion concerning rehabilitation (28 MJ at 304) and the importance of avoiding command influence in the sentencing process—all apply with the same degree of force to rebuttal evidence as to evidence in aggravation. Where a rehabilitation opinion lacks a proper "rational basis" or presents a risk of command influence, the opinion is no less objectionable because it is offered at the rebuttal stage rather than at the aggravation stage of the sentencing proceeding.

The military judge at trial, the judge who dissented below, and the Government in this Court all complain in essence that it is unfair for the defense to open this door by offering evidence of good rehabilitation potential and then to preclude the Government from rebutting in kind. Although this plea has a superficial appeal, it suffers from a misunderstanding of the basis of our opinions in this area.

■ To illustrate, if the *defense* evidence as to rehabilitation lacks "a rational basis" —for instance, if the witness knows little or nothing about the individual accused, his character, and his performance—that evidence is objectionable as irrelevant and immaterial. The Government's remedy is exclusion of the defense evidence by timely objection or motion to strike—and not so-called rebuttal by equally irrelevant and immaterial opinion to the contrary. The Government cannot overcome waiver of its objection (*see* Mil.R.Evid. 103(a)(1), Manual, *supra*) with the subsequent proffer of inadmissible evidence.[2] On the other hand, if the defense evidence as to rehabilitation is properly based, it is not relevant "rebuttal"

to offer an opinion to the contrary, unless that opinion also is properly based.[3]

The point is that, regardless of who offers the opinion evidence and regardless of when it is offered, it is admissible if the witness has a "rational basis for his conclusions," 28 MJ at 304, and inadmissible if the witness does not have such a basis. Upon this premise, *Ohrt* and its progeny apply fully to rebuttal, just as they do to the Government's sentencing case-in-chief.

### B

■ Our decisions clearly prescribe that testimony about an accused's rehabilitation potential is irrelevant if it is predicated on the severity or nature of the offense rather than on the character and nature of the individual. *See United States v. Claxton, supra; United States v. Corraine,* 31 MJ 102 (CMA 1990); *United States v. Aurich,* 31 MJ 95 (CMA 1990); *United States v. Wilson,* 31 MJ 91 (CMA 1990); *United States v. Kirk,* 31 MJ 84 (CMA 1990); *United States v. Cherry,* 31 MJ 1 (CMA 1990); *United States v. Gunter, supra; United States v. Antonitis,* 29 MJ 217 (CMA 1989); and *United States v. Ohrt, supra.*

The majority in the Court of Military Review decided that Major Rhye's opinion that Pompey lacked rehabilitation potential in his unit clearly was based on the witness' personal view of the offense appellant had committed. This decision not only was well within the factfinding powers of the court below; but, indeed, it was inescapable on the basis of Major Rhye's own testimony. The witness had conceded that, apart from the single offense of wrongful

---

2. This is not a situation in which we would apply the doctrine of "curative inadmissibility."

3. This hypothetical may be extrapolated from our opinion in *United States v. Gunter,* 29 MJ 140 (CMA 1989): A defense expert witness testifies that he has treated an accused on a daily basis for weeks and is thoroughly familiar with his personal and professional history and that, on this basis, he believes that the accused has an excellent potential to rehabilitate himself. In

"rebuttal," the Government offers an expert witness who acknowledges that he has never seen the accused and knows nothing of his personal or professional background; but notwithstanding his blissful state of ignorance, he opines that the accused's rehabilitation potential is poor. The latter testimony is inadmissible because the witness has no "rational basis for his conclusions," and it does not somehow become admissible just because it purports to "rebut" a rationally based opinion offered by the defense.

use, Pompey had been an absolutely outstanding airman. Under these circumstances, it was for the court-martial members to decide what sentence was appropriate without being encumbered by Major Rhye's generalized view that any airman who had used cocaine had no rehabilitation potential.

III

The certified question is answered in the negative, and the decision of the United States Air Force Court of Military Review setting aside the sentence is affirmed.

Chief Judge SULLIVAN and Judge COX concur.