**UNITED STATES, Appellee**

v.

**Jose A. OQUENDO, Staff Sergeant
U.S. Army, Appellant.**

No. 66,690.
CM 8901274.

U.S. Court of Military Appeals.

Argued Jan. 9, 1992.

Decided Aug. 21, 1992.

For Appellant: *A. Luis Ortiz* (argued); *Captain Michael P. Moran* (on brief).

For Appellee: *Captain Samuel J. Smith, Jr.* (argued); *Colonel Dayton M. Cramer, Lieutenant Colonel Daniel J. Dell'Orto, Major Kenneth T. Grant* (on brief); *Captain Timothy J. Saviano.*

*Opinion of the Court*

SULLIVAN, Chief Judge:

During March and April 1989, appellant was tried by a special court-martial composed of enlisted members at Fort Benjamin Harrison, Indiana. Contrary to his pleas, he was found guilty of one specification of engaging in an improper senior/subordinate relationship and two specifications of adultery, in violation of Article 134, Uniform Code of Military Justice, 10 USC § 934. He was also found guilty of one specification of failure to obey a lawful order by engaging in an improper senior/subordinate relationship, in violation of Article 92, UCMJ, 10 USC § 892. The members sentenced appellant to a bad-conduct discharge and reduction to the grade of private E–1. The convening authority approved this sentence on August 18, 1989. The Court of Military Review dismissed the order offense noted above; reassessed the sentence in light of this action; but, nonetheless, affirmed the remaining findings and sentence on February 8, 1991.

On September 13, 1991, this Court granted review on the following question:

WHETHER THE MILITARY JUDGE ERRED BY OVERRULING DEFENSE COUNSEL'S OBJECTION TO PERMITTING LTC ETHRIDGE AND CSM SMOTHERS TO OFFER THEIR OPINION OF APPELLANT'S REHABILITATIVE POTENTIAL IN THE ARMY WHEN THEIR OPINIONS WERE BASED SOLELY ON THE OFFENSES FOR WHICH APPELLANT WAS CONVICTED.

In view of the Government's concession of error and our own finding of prejudicial error, we set aside the sentence and order a resentencing in this case. *See generally United States v. Pompey*, 33 MJ 266 (CMA 1991); *United States v. Aurich*, 31 MJ 95 (CMA 1990).

 At the sentencing portion of this court-martial, defense counsel moved *in limine* to prevent two government witnesses from testifying against appellant. The record states:

MJ: The Court is in session. All parties to the trial [present] when the court recessed are again present in court. Anything before we call the jury?

DC: Yes, sir, it's the defense's understanding that the prosecutor intends to call Lieutenant Colonel Ethridge and Sergeant Major Smothers to the stand in aggravation. It's the defense's position that any adverse information or opinion that they have about Sergeant Oquendo resulted from the offense that was charged here or the charges that were previously pending against the accused prior to the trial, and results from exposure to the letters which were seized from the box that has been—the fruits of which have been suppressed. In other words, their opinion has been tainted by the illegal search, and is also the result of the charges that are before the court. Given that, their opinions are (a) not relevant, and (b) should not be admissible because they are based upon and cause they are based upon and tainted by improperly obtained evidence.

MJ: As I understand your position, Captain Scully, you believe that Lieutenant Colonel Ethridge and Sergeant Major Smothers should not be allowed to testify as to the rehabilitation of the accused since their opinion is based solely on the charges of which the accused has been convicted or the charges which have been withdrawn?

DC: That's correct, sir.

MJ: And Captain Butler, what's your position?

TC: Sir, the response is that the question that I've asked Colonel Ethridge and Command Sergeant Major Smothers before and I anticipate asking them today is-based on everything you know about the accused, do you feel he has any rehabilitative potential to remain in the service. Now, that encompasses everything they know about these charges, about charges that might have been filed had the letters not been suppressed, about the letters being found and about everything they have personal knowledge of concerning Staff Sergeant Oquendo. And—

MJ: Well, do they—. Would you agree with the proposition that the law is that the witness cannot testify as to rehabilitative potential if his opinion is based solely on the charges of which the accused has been convicted?

TC: Yes, sir.

MJ: Okay. Let's suppose that the accused had not—let's suppose that the evidence had not been suppressed and that the accused was brought to trial on the other charges, and that he'd been convicted of those charges. Would they now be allowed to testify?

TC: Yes, sir, because there were more letters from other trainees that had not been contacted and I think—

MJ: You're saying these letters, which you must remember, of course, I've not read any of these letters—

TC: Right, sir.

MJ: —in Appellate Exhibit XIX. Are you saying that there are letters in there other than those pertaining to the Lieutenant that might indicate some misconduct?

TC: Right, sir.

MJ: Are you saying their testimony is based not only on the charges of which the accused has been convicted and the charges that have been withdrawn, but also the other letters which indicate misconduct?

TC: Yes, sir. And one of them specifically is—

MJ: You don't need to delineate that for me. If that's your belief, then I'll allow you to call the witness.

TC: Yes, sir.

MJ: Any comment on that, Captain Scully or Mr. Ortiz?

DC: Only that the evidence—that additional evidence—those additional letters did not form the basis for charges, were none the base improperly seized, and I would submit that it's impossible to distinguish between the Fouquette incident, or the knowledge about Fouquette, the knowledge about King and the knowledge about these other people. In other words, it's all a mass of information that has (a) resulted in charges, and (b) been improperly seized. And the opinions are therefore not admissible (a) because they are tainted by that illegal search and (b) because they result from the—essentially from the charges that we are here today on.

MJ: The objection is overruled. Call your witnesses.

Lieutenant Colonel Ethridge testified that, based on everything he knew about appellant, he did not feel appellant had rehabilitative potential to remain in the United States Army. On cross-examination, however, he stated:

Questions by the defense:

Q: Sir, I believe you stated earlier that, prior to discovery of this offense, or these offenses, it was your opinion that Sergeant Oquendo was one of the best NCOs you ever ran across?

A: That's true.

Q: And what things about him led you to that opinion, sir?

A: I had an opportunity to observe Sergeant Oquendo almost on a daily basis in doing his job as the battalion supply sergeant. He's energetic; he's dynamic; you don't have to tell him twice to get things done; he sees things that need to be done and he goes out and he gets the[m] accomplished.

Command Sergeant Major Russell Smothers also testified as a government witness on sentencing. He stated that, "based on everything that he knew about" appellant, he felt that appellant had "absolutely" no "rehabilitative potential to remain in the service." He also acknowledged appellant's outstanding military service to the company, prior awards, and performance recommendations.

In his closing argument, trial counsel specifically commented on the testimony of these witnesses, arguing: "He deceived his chain of command, his co-workers, but he didn't deceive you as panel members and his chain of—his chain of command came in here today and told you that he has no rehabilitative potential to remain in the Army and you should give that testimony the weight due it."

---

Appellate defense counsel in this case argues that the testimony of the government aggravation witnesses, Ethridge and Smothers, violated both *United States v. Horner*, 22 MJ 294 (CMA 1986), and *United States v. Ohrt*, 28 MJ 301 (CMA 1989). First, he asserts that their opinions on appellant's total lack of rehabilitative potential were improperly based on the severity

of the offenses for which appellant was charged and found guilty. Second, he asserts that these prosecution witnesses improperly extended their opinions to include their negative views on appellant's retention in the armed service. Appellate government counsel disagrees with the above two grounds but concedes the testimony of each of these witnesses was improperly based on unconstitutionally seized evidence. We conclude that admission of this evidence substantially violated the decisions of this Court noted above. *See also United States v. Corraine*, 31 MJ 102, 106 (CMA 1990).

■ The second question is whether there was prejudice from the erroneous admission of this testimony. Art. 59(a), UCMJ, 10 USC § 859(a). We note initially that these witnesses were called by the prosecutor in aggravation and their ultimate opinions were unequivocally adverse to appellant. Thus, the Government's argument that favorable portions of each of these witnesses' testimony established no prejudice is most unpersuasive. Second, these government witnesses were appellant's immediate superiors in his command; as such, their views would logically be afforded serious consideration by the court-martial members. Third, appellant offered extensive sentencing evidence in his behalf, including seven witnesses who testified to his prior outstanding military service. Finally, the trial counsel skillfully exploited the testimony of these command witnesses in his closing argument so as to effectively undermine the defense's sentencing case. In these circumstances, a new sentencing proceeding is required. *See generally United States v. Cherry*, 31 MJ 1, 6 (CMA 1990).

The decision of the United States Army Court of Military Review as to sentence is reversed. The sentence is set aside. The record of trial is returned to the Judge Advocate General of the Army. A rehearing on sentence may be ordered.

Judges COX, GIERKE, and WISS concur.

CRAWFORD, Judge (concurring in part and dissenting in part):

Three additional issues need to be addressed. First, the evidence presented by the Government at sentencing was not based solely on the severity of the offenses but also on the witnesses' exposure to thirteen letters sent to appellant from female trainees which the judge had suppressed as illegally seized during the Government's case-in-chief. Second, various Federal courts have addressed the issue of the use of illegally seized evidence during sentencing and most have held that the exclusionary rule does not apply to this evidence. *See infra.* Third, the evidence should be viewed in its totality in considering whether the error, if any, was harmless. Art. 59(a), Uniform Code of Military Justice, 10 USC § 859(a).

In order to discuss these issues it is first necessary to set forth additional testimony from Lieutenant Colonel Ethridge and Command Sergeant Major Smothers, as follows:

## DIRECT EXAMINATION

Questions by the prosecution:

Q: Sir, how long have you known the accused in this case, Staff Sergeant Oquendo?

A: I've known him for about 10 months[.]

Q: And you knew about how—or you know about how good of a record and how good of record of a soldier he has?

A: Yes.

Q: Okay. Based on everything that you know about the accused, do you feel that he has the rehabilitative potential to remain in the United States Army?

A: No, I do not.

Q: That's all the questions I have, sir.

MJ: Any cross?

DC: Yes, sir.

## CROSS–EXAMINATION

Questions by the Defense:

Q: Sir, I believe you stated earlier that, prior to discovery of this offense, or these offenses, it was your opinion that Sergeant Oquendo was one of the best NCOs you ever run across?

A: That's true.

Q: And what things about him led you to that opinion, sir.

A: I had an opportunity to observe Sergeant Oquendo almost on a daily basis in doing his job as the battalion supply sergeant. He's energetic; he's dynamic; you don't have to tell him twice to get things done; he sees things that need to be done and he goes out and he gets the[m] accomplished.

Q: Yes, sir. Is he—his EERs were quite good?

A: The one EER that I saw was quite good. I don't know what's contained in his OMPF.

Q: When he was the supply sergeant, his performance a[t] supply was quite good in the battalion, was it not?

A: Outstanding.

Q: In fact, he was the best supply room in the battalion for a couple of quarters; is that——?

A: When he was a company supply sergeant, he consistently had a very good company supply operations. As the battalion supply sergeant, he's the best supply sergeant I've ever known in the Army.

Q: Okay. And you recommended him for drill sergeant school?

A: Yes, I did.

Q: And also for Warrant Officer?

A: Yes, I did.

Q: Were you aware that he'd been promoted to Staff Sergeant within 40 months of being in the Army?

A: No, I was not aware of that.

Q: Were you aware that he was cited for his outstanding leadership abilities at BNOC?

A: I was aware of that.

Q: Is it not also true that when the charges—when it first came to your attention that there might be some charges against Sergeant Oquendo, you allowed him to remain in BNOC and did not pull him out of BNOC?

A: That's true. I was given the decision to either pull him out of BNOC and bring him back to Fort Harrison and deny him the opportunity to graduate or to allow him to stay at Fort Lee and graduate, and I decided to leave him down there out of respect and my feelings for Sergeant Oquendo. Because I felt like he needed the opportunity to graduate from BNOC.

\* \* \*

Command Sergeant Major Russell Smothers was recalled as a witness for the prosecution, was sworn and testified as follows:

## DIRECT EXAMINATION

Questions by the prosecution:

Q: You're Command Sergeant Major Russell Smothers?

A: Yes, sir.

Q: And your current duty assignment is what?

A: Command Sergeant Major of the 2nd Battalion, Troop Brigade.

Q: And how long have you been in that position?

A: Approximately 15 months.

Q: Do you know the accused in this case, Staff Sergeant Oquendo?

A: Yes, I do.

Q: And how long have you known Staff Sergeant Oquendo?

A: Approximately 15 months, since I've been here.

Q: Okay. Based on everything that you know about the accused, do you feel that he has the rehabilitative potential to remain in the service?

A: Absolutely none.

Q: That's all the questions I have, sir.

MJ: Any cross?

## CROSS EXAMINATION

Questions by the defense:

Q: Sergeant Major, you say absolutely none, but—

A: Yes, sir.

Q: Yet were you consulted, or did you recommend orally in any other way—make any recommendation to the battalion commander regarding Sergeant Oquendo's application for drill sergeant school?

A: Sir, I did a lot of things for Sergeant Oquendo [whe]ther it be with Department of the Army or the battalion commander in reference to trying to bring Sergeant Oquendo along through mentoring and leadership methods.

Q: Okay. Simply yes or no though to the question will be adequate. Did you make a recommendation to the battalion commander one way or another on his application for drill sergeant school?

A: Yes, sir, I did.

Q: Thank you. And how about his application for Warrant Officer school?

A: Yes, sir, I talked to him about that.

Q: And your recommendations on both of those things were positive; correct?

A: When I—yes, sir.

Q: Okay. And he also maintained—you're also aware that he maintained an excellent company supply room when he was a company supply sergeant do you not?

A: Yes, sir, I am.

Q: In fact, he had the best company supply room in the battalion for a couple of quarters in a row, [did] he not?

A: I don't know if they were in a row; I don't know.

Q: Okay. A couple of quarters?

A: He'd been recognized as having the best at one time or another, maybe two.

Q: Okay. And you did recommend him for NCO of the quarter or he was recognized for being the NCO of the quarter for 2nd Battalion?

A: He was selected from a small group of people that competed for that honor; yes.

Q: Okay. And also was recommended for NCO of the year? Was that from the battalion or was that from the post?

A: No, no, sir, that was NCO of the quarter for Post board.

Q: For the post board; okay.

A: Yes, sir.

Q: And he was—you recommended him for that?

A: Yes, sir, I did.

Q: Okay. And you're aware that he was cited for his leadership abilities at BNOC? Were you not aware of that?

A: Sir, I have not talked to Sergeant Oquendo about his BNOC attendance so I would not know that.

RCM 1001(b)(5), Manual for Courts–Martial, United States, 1984, which has been tempered by *United States v. Horner,* 22 MJ 294 (CMA 1986), provides:

> The trial counsel may present, by testimony or oral deposition ... evidence, in the form of opinion, concerning the accused's previous performance as a servicemember and potential for rehabilitation. On cross-examination, inquiry is allowable into relevant and specific instances of conduct.

The Court in *Horner* noted that, while a witness may give insights as to the accused's personal circumstances, this does not allow a witness to give an estimation of the required punishment. This Court has summarized its earlier decisions as follows:

> The primary thrust of these decisions is that this Manual rule does not permit a commander to give an opinion on a servicemember's "potential for rehabilitation" if his opinion is based solely on his view of the severity of the offense. The proffered rationale for this holding was the Court's conclusion that the only opinion testimony permitted by this rule is that which is rationally based on an individual assessment of a servicemember's character and potential....
>
> A secondary thrust ... concerns the scope of the opinion which a commander may present to the members for purposes of sentencing. These decisions suggest that RCM 1001(b)(5) does not

authorize admission of a commander's opinion as to an appropriate punishment for the offenses for which a servicemember has been found guilty at a court-martial. . . .

A third aspect ... is the euphemism rule which was announced in *United States v. Ohrt*, 28 MJ [301 (CMA 1989) ]. . . . There, this Court indicated that a commander's opinion stopping short of expressly recommending a punitive discharge, but which impliedly advocated separation from the service, was also prohibited at courts-martial.

*United States v. Cherry*, 31 MJ 1, 4–5 (CMA 1990). Here, the Government could have laid a better foundation on direct examination for the rehabilitative-potential evidence offered by establishing that the witnesses were personally acquainted with appellant; the witnesses knew appellant well enough to have formed a reliable opinion of his rehabilitative potential; the witnesses had such an opinion; and the witnesses' opinion was not based on the severity of the offense. *See United States v. Green*, 32 MJ 36 (CMA 1990).

As was brought out on cross-examination, however, the battalion commander had the opportunity to observe appellant almost on a daily basis and had known appellant for 10 months. Likewise, the command sergeant major had known appellant for 15 months and had observed him in two separate positions. A training battalion is not an ordinary troop battalion. The permanent cadre is small and in fact is smaller than that of an ordinary company. Hence, the battalion commander and the command sergeant major in this case were personally acquainted with appellant, had seen him frequently enough to form an opinion about his rehabilitative potential, and had, in fact, formed that opinion.

At issue is only whether their opinions on appellant's rehabilitative potential were based solely on their view of the severity of the conviction. Evidence consisting of thirteen explicit letters written to appellant by at least five female trainees was sup-

pressed by the military judge at an Article 39(a) * session prior to the Government's case-in-chief. *See* Appendix for a sample of their contents. This evidence reflected upon appellant's performance of his duties and was known to the two government witnesses. Unfortunately, all parties of the trial danced around the real basis for the witnesses' testimony rather than confronting it head on. As indicated in the testimony quoted in the majority opinion, the evidence concerning the basis for the lack of rehabilitative potential was based primarily on these explicit letters which had been suppressed.

We note that the majority federal rule does not apply the Fourth Amendment exclusionary rule to the sentencing phase of a trial. *See, e.g., United States v. McCrory*, 930 F.2d 63 (D.C.Cir.1991) (if not intentional violation), *cert. denied*, —— U.S. ——, 112 S.Ct. 885, 116 L.Ed.2d 788 (1992); *United States v. Butler*, 680 F.2d 1055 (5th Cir.1982). *Cf.* Mil.R.Evid. 311(e)(2), Manual, *supra*. Since the issue of applicability of the exclusionary rule to evidence sought to be introduced at sentencing is not before us in this case, the Court does not address it at this time. However, if there was error here, I believe that it was unquestionably harmless. Art. 59(a).

Numerous witnesses testified to appellant's good military character on the merits. Additionally, the cross-examination at sentencing of both CSM Smothers and LTC Ethridge was very favorable to appellant. The Government's hands were literally tied as its witnesses could not testify as to the basis for their opinion regarding the lack of rehabilitative potential of appellant. This predicament not only artificially strengthened their testimony favorable to appellant, but also made their testimony on cross-examination appear to flatly contradict their opinion on direct examination.

Appellant received a sentence well within what would be reasonable and appropriate for the offenses of which he stands convicted. The maximum sentence that could have been adjudged at this special court-martial was a bad-conduct discharge, con-

---

* Uniform Code of Military Justice, 10 USC § 839(a).

finement for 6 months, forfeiture of ⅔'s pay per month for 6 months, and reduction to the lowest enlisted grade. Art. 19, UCMJ, 10 USC § 819. Moreover, the evidence demonstrates that appellant abused his position of leadership in becoming involved in an improper relationship with a female trainee. Appellant was a non-commissioned officer who failed to set an appropriate example and very likely committed perjury by testifying that he never received mail at his unit and never fraternized with officers.

Accordingly, I would affirm the decision below.

### APPENDIX

Janice stated, "Oh by the way I'm not the first person you wanted to get together with. Boy did I get the scoop on you. Your not as good as I thought you were."

Barbara from Clearwater, MN, indicated, "You and I haven't been fair to your wife or your marriage.... You spoke of how you needed some 'good sex'! But we could only get together if it was all planned in advance...."

Another letter from Barbara from Clearwater stated, "I've never felt so close to a man while making love. It's very special. It's like we become one! Do you agree? ... This letter is going to self-destruct if it gets any hotter!!"

And Barbara said in still another letter, "As you say, 'I go crazy.!' "