UNITED STATES, Appellee,

v.

Derrick E. PATTERSON, Sergeant,
U.S. Army, Appellant.

No. 99–0901.
Crim.App. No. 9800417.

U.S. Court of Appeals for
the Armed Forces.

Argued Feb. 29, 2000.

Decided Sept. 8, 2000.

Gierke, J., filed an opinion concurring in the result, in which Cox, Senior Judge, joined.

SULLIVAN, J., delivered the opinion of the Court, in which CRAWFORD, C.J., and EFFRON, J., joined. GIERKE, J., filed an

opinion concurring in the result, in which COX, S.J., joined.

For Appellant: *Major Kirsten V.C. Brunson* (argued); *Colonel Adele H. Odegard* and *Major Scott R. Morris* (on brief).

For Appellee: *Captain Arthur L. Rabin* (argued); *Colonel Russell S. Estey, Lieutenant Colonel Eugene R. Milhizer,* and *Major Patricia A. Ham* (on brief).

Judge SULLIVAN delivered the opinion of the Court.

During the Spring of 1998, appellant was tried by a general court-martial composed of a military judge sitting alone at Fort Benning, Georgia. Pursuant to his pleas, he was found guilty of 2 specifications of raping a child under 16 on divers occasions, 2 specifications of forcible sodomy of a child under 12 on divers occasions, 4 specifications of committing indecent acts with a child, disobedience of a lawful order, and damaging military property, in violation of Articles 120, 125, 134, 90, and 108, Uniform Code of Military Justice, 10 USC §§ 920, 925, 934, 890, and 908, respectively. On March 20, 1998, he was sentenced by a military judge to a dishonorable discharge, 45 years' confinement, total forfeitures, and reduction to pay grade E–1. On May 21, 1998, the convening authority, in accordance with his pretrial agreement, reduced confinement to 25 years but otherwise approved the adjudged sentence. The Court of Criminal Appeals affirmed the findings of guilty and sentence in a memorandum opinion on January 22, 1999, and again on April 12, 1999, on reconsideration.

This Court on December 9, 1999, granted review on the following issue of law:

WHETHER THE MILITARY JUDGE ABUSED HIS DISCRETION AND MATERIALLY PREJUDICED APPELLANT'S RIGHT TO A FAIR TRIAL BY PERMITTING IRRELEVANT EXPERT TESTIMONY CONCERNING TREATMENT OF PEDOPHILES AT THE SENTENCING PHASE OF TRIAL WHEN THERE HAD BEEN NO DIAGNOSIS OF APPELLANT AS A PEDOPHILE AND THE EXPERT WAS NOT QUALIFIED TO PREDICT APPELLANT'S RESPONSIVENESS TO TREATMENT.

We hold that no error was committed by the military judge in admitting the expert testimony on "grooming" to explain the impact of the offenses on the victim. Any error that may have been committed in admitting expert testimony concerning a groomer's lack of potential for rehabilitation was not plain error requiring the reversal of appellant's sentence. *See United States v. Stinson,* 34 MJ 233, 238–39 (CMA 1992) (presumption that military judge will properly evaluate testimony in context of evidentiary rules).

At the time of his court-martial, March 20, 1998, appellant was a 31–year–old married Sergeant (E–5) with approximately 6 years of active Army service. He had two children, an 8–year–old son and a 9–year–old daughter. On January 4, 1998, his daughter told her mother that appellant had been sexually abusing her. When interviewed by the Criminal Investigative Command (CID) at Fort Benning, Georgia, appellant admitted that he had been sexually abusing his daughter since she was 5. The abuse began while his family was in Germany. Initially, appellant merely massaged his daughter's naked body and touched her private areas. Later, he began rubbing his penis against her body, and soon thereafter, he persuaded his daughter to masturbate him. Over time, the abuse escalated into sexual intercourse and sodomy. The sexual activity continued after appellant's family moved to Georgia.

After his confession to the CID, appellant was given a written order by his company commander to avoid any contact with his wife and children. On January 10, 1998, appellant disobeyed the no-contact order when he broke his restriction from the fourth floor of Martin Army Community Hospital and ran to his on-post quarters. He yelled at his wife to open the door. After the wife and children exited through the back door, appellant broke the front door down. The damage to the door was in excess of $100.00. Appellant wanted to get the keys to his truck and flee Fort Benning. However, the military police arrived at the quarters and blocked his escape.

The Government called as a sentencing witness Lieutenant Colonel (Doctor) William S. Evans, Chief of Child Adolescent Family Psychiatry at Eisenhower Medical Center. He testified that he met and talked with appellant's wife, examined appellant's daughter, and talked with her therapist. (R. 65). He stated that he did these things in order to testify "about the impact these crimes may have on [appellant's daughter] and her family" and to "learn[ ] about the accused and any possible condition he may have." (R. 66). The defense stipulated that he was an expert in the fields of general psychiatry and child and adolescent psychiatry. (R. 71). However, it objected to this witness "classifying any psychiatric orders or disorders that [appellant] may have on the grounds that he does not have personal knowledge, has not conducted the appropriate interviews . . . [to] adequately lay sufficient foundation for him to make a prognosis." (R. 76). The military judge sustained the defense's objection. (R. 78).

Doctor Evans then was asked a series of questions concerning the impact of the charged offenses on appellant's daughter.

Q. Sir, [EP's] provocativeness at the age that she is now, how do you believe that came about?

A. My assumption would be that would be one of the behaviors that dad had rewarded or fostered along the way, some little smiles or other things are something that did sort of at some level either overtly or covertly gave her a message that that was nice, he liked that.

Q. And actions by dads like that, sir, is there—what is that called in the field of psychiatry?

A. I think what you're referring to is grooming.

Q. And could you explain grooming, the idea of grooming?

A. *When I talk about grooming it's a particular description of activities in a pedophile—*

DC: Objection, Your Honor. We've already covered this area regarding a diagnosis of Sergeant Patterson. You've ruled that Colonel Evans doesn't have the requisite knowledge to discuss that regarding Sergeant Patterson himself.

MJ: *I am going to allow this testimony though, however, as it impacts the—how these offenses were committed and how—and what goes into committing them.* And I understand that to be what the doctor is testifying about now. *He's not specifically testifying about Sergeant Patterson,* but is testifying about how these offenses were probably committed as evidence[d] by his examination of this person. Is that correct or am I—

WIT: I believe so, sir.

MJ: Okay, if I'm not then I'm certainly subject to not being correct. Why don't you just sort of correct me if you think that I'm incorrect on it.

WIT: I think so.

MJ: Okay, I think I'm in the ballpark. Okay. I'm going to overrule your objection; *that's at least the way I'm going to consider it.*

DC: Thank you.

MJ: If there is something else you need to tell me about that doctor then let me know. Go ahead.

Q. Sir, explain to us grooming, could you?

A. Grooming is a description of how one starts to engage children, starting from just—it could be facial contact. How one goes about talking to them. How one initiates initial sexual contact, and how one then over a period of—it could be of days to weeks to in this case years escalates that to more and more activity, more and more varied different types of sexual activity, all the way up to sexual intercourse and the like. *So, it's just a fairly well documented phenomena of what certain individuals do to seduce children.* I mean clearly they can't go from point "A" to home base in one step, and what it describes is how they get there, and it's well documented out there, the steps. I mean you can go and probably find books that talk you through it; Step A, Step B, Step C.

Q. Sir, you reviewed the statements by the accused and the statements by [EP] before you came here?

A. Yes, I did.

Q. Did you see a pattern of grooming in those statements?

A. I did see a pattern of grooming that lured me very much.

Q. Can you describe what you saw, that you saw as grooming?

A. What I saw was descriptions of some initial just touching back when she was 4 to 5 gradually progressing to more and more touching to fellatio to eventually to—I guess what we would call intercourse. I think that was established in—

Q. Sir, would sex games often be one of the steps in grooming?

A. That could be one of the tools. Like in this case I believe it was the microphone game that was played. I mean that's one of the ways you might go about seducing children.

Q. *Sir, have you treated or seen patients before, adult males, that had this course of conduct that they committed this grooming with children?*

A. *Yes, I have.*

Q. *And you reviewed literature—have you reviewed literature on those who groom young children regarding their treatment and the success of their treatment?*

A. There's a lot of literature out there that talks about how one could go about treating these individuals. And what one finds out is that there's no necessarily agreed on good treatment versus not so good treatment. And *there's no real outcome studies that are really saying that it's particularly effective no matter what we've tried.*

Q. What has been tried, sir?

A. I know some countries and some states have tried chemical castration. Some countries have tried actual castration of the individuals. There are all sorts of therapy. There's aversion therapy. In Texas they have some pilot programs now where they basically put the person back in the community, but they pretty much follow them around all the time. *And again there are no good studies saying*

*that any of this ultimately prevents that individual from re-offending.*

Q. *So, would it be correct to say then that nothing has been medically proven to be successful to cure one who has previously manifested this conduct, the grooming? Would it be correct to say that?*

A. *Not that I've seen.*

(R. 84–88) (emphasis added).

— — —

Appellant's argument before this Court is that the military judge erred in allowing Doctor Evans to testify about "the habits of pedophiles" and the absence of effective "treatment programs for pedophiles." Final Brief at 6, 8. He asserts that the trial judge ruled Doctor Evans was not competent or qualified to diagnose appellant as a pedophile and, therefore, any testimony concerning pedophilia was incompetent and irrelevant. He finally argues that Doctor Evans' testimony and trial counsel's exploitation of it in his closing argument unfairly influenced the military judge to give him a 45–year sentence.

▪ We first note that the government witness, Doctor Evans, did not expressly testify that appellant was a *pedophile.* He did testify that "grooming" was a term that described certain activities of a pedophile and "grooming" occurred in this case. However, the military judge earlier made clear that he would *not* consider this witness' testimony on appellant's psychiatric or psychological condition because he failed to personally examine him. (R. 78). Accordingly, even if Doctor Evans' testimony implicitly labeled appellant a pedophile, we conclude there was no violation of the trial judge's expert-witness-disqualification ruling. *See United States v. Davis,* 44 MJ 13, 17 (1996); *United States v. Kinman,* 25 MJ 99, 100–01 (CMA 1987) (appellate court assumes that military judge will do what he says he will do); *see generally* Mil.R.Evid. 105, Manual for Courts–Martial, United States (1998 ed.) (evidence may be admitted for one purpose but be restricted in its use for other purposes).

▪ Turning to the actual testimony of Doctor Evans, we note that he was called by the Government as a sentencing witness at

appellant's court-martial and did provide expert testimony in this case. *See* RCM 1001(b), Manual, *supra* (matters to be presented by the prosecution). He testified that it was his expert opinion that appellant's daughter "will suffer significant problems in the future based on her sexual abuse." (R. 78). He stated that she would suffer in two major ways:

Presently based on my evaluation she has two reasonable diagnoses. The first being posttraumatic stress disorder, which has occurred because of the 4 to 5 year history of sexual abuse by her father. And the second being a dissociative disorder not otherwise specified.

He also explained "other ways" in which these psychiatric problems would manifest themselves as she grew older and entered puberty. (R. 83).

So I think that's one of the issues that may follow her throughout her life. [Anger at mother]. *Another issue being although not to an excessive degree she does come across as somewhat of a flirtatious sort of provocative young lady for her age.* And one would worry that some of that may— what you may really have is an altered view of sexuality and an altered view of her body. Again, you can only predict how that might play itself out as she becomes an adult. Some becoming excessively promiscuous; others don't have any relationships at all, and I don't know where that's going to go for her, but at least it's not on target now.

Finally, as noted earlier, he explained that the victim's unusual flirtatious or provocative actions could be traced to appellant's "grooming" conduct.

RCM 1001(b)(4) states:

(4) *Evidence in aggravation. The trial counsel may present evidence as to any aggravating circumstances directly relating to or resulting from the offenses of which the accused has been found guilty.* Except in capital cases a written or oral deposition taken in accordance with RCM 702 is admissible in aggravation.

(Emphasis added.) The discussion to this Manual provision further states:

**Discussion**

*Evidence in aggravation may include evidence of financial, social, psychological, and medical impact on or cost to any person or entity who was the victim of an offense* committed by the accused and evidence of significant adverse impact on the mission, discipline, or efficiency of the command directly and immediately resulting from the accused's offense.

(Emphasis added.) There was no objection by the defense that Doctor Evans was incompetent or unqualified to testify as to the impact of appellant's offenses on his daughter. (R. 71, 78).

The testimony on "grooming" objected to by appellant at trial and on appeal was admitted by the military judge to show the psychological impact of appellant's offenses on the victim in this case. (R. 85–86). This situation is similar to that presented in *United States v. Irwin*, 42 MJ 479, 483 (1995), where evidence of threats made to a victim of rape during the rape were admitted to show the special impact of that offense on the victim. *See also United States v. Wilson*, 47 MJ 152, 155 (1997) (evidence of victim's special circumstances admitted which gave rise to enhanced impact of offense on victim); *United States v. Jones*, 44 MJ 103, 104 (1996) (evidence of accused's medical condition subjecting victim to risk of fatal disease was relevant as aggravating circumstance). We see no abuse of discretion in the admission of Doctor Evans' testimony on "grooming" for this purpose. *See* Mil.R.Evid. 105 (limited admissibility of evidence). *See generally United States v. Wilson, supra.*

■ The final question in this case concerns Doctor Evans' additional testimony that persons who groom children for sexual abuse are not capable of rehabilitation. Such testimony may have violated the military judge's earlier ruling in this case to the extent that it addresses appellant's psychological state and suggests that he could not be rehabilitated. (R. 78). Nevertheless, defense counsel did not specifically object to trial counsel's questions on this basis (R. 87), and we conclude the admission of such evi-

dence was not plain error. *See* RCM 1001(b)(4) Manual, *supra* (evidence of rehabilitation potential generally admissible).

Appellant was found guilty of an extraordinary number of sexual offenses against his own daughter, a minor child, over a 5–year period. The inability-to-rehabilitate evidence and argument was a small part of the Government's sentencing case (R. 142), which otherwise called for severe punishment of appellant on the basis of the outrageousness of his offenses and their terrible impact on his daughter. *See United States v. Scott,* 51 MJ 326, 330 (1999). Moreover, as noted above, the military judge's earlier *in limine* ruling restricted his consideration of Doctor Evans' testimony to the impact of the appellant's offenses on the victim. We are confident that he adhered to his own ruling and did not consider the expert's testimony on the question of appellant's psychological state or his rehabilitative potential. *See United States v. Davis, supra; United States v. Raya,* 45 MJ 251, 253–4 (1996). Accordingly, we find no material prejudice occurred to appellant's substantial rights as a result of the admission of this testimony.*

The decision of the United States Army Court of Criminal Appeals is affirmed.

GIERKE, Judge, with whom COX, Senior Judge, joins (concurring in the result):

I disagree with the majority's treatment of this case as a plain-error case. Defense counsel made a timely objection to Lieutenant Colonel (LTC) Evans testifying about his diagnosis of appellant, on the ground that there was no foundation for LTC Evans' diagnosis. The military judge sustained the objection.

When LTC Evans later strayed from his diagnosis of the victim to describing his "assumption" that the victim was groomed by appellant, defense counsel again objected. This time, the military judge overruled the objection, stating that LTC Evans "is not specifically testifying about Sergeant Patterson, but is testifying about how these offenses were probably committed as evidence[d] by his examination of this person." Thus, LTC Evans was permitted to testify about his "assumption" that appellant had groomed the victim and about the rehabilitative potential of "those who groom young children." He opined that there is no medically proven cure for such a person.

In my view, defense counsel's two specific objections were sufficient to preserve the issue for appellate review. I am also satisfied that the military judge erred. In *United States v. Horner,* 22 MJ 294, 296 (CMA 1986), this Court stated that an opinion about rehabilitative potential is "simply not helpful" if it is not based on assessment of an accused's character and potential. In *United States v. Ohrt,* 28 MJ 301, 304 (CMA 1989), this Court stated that "a foundation must be laid to demonstrate that the witness does possess sufficient information and knowledge about the accused—his character, his performance of duty as a servicemember, his moral fiber, and his determination to be rehabilitated—to give a 'rationally based' opinion." While *Horner* and *Ohrt* dealt with lay witness testimony, the same foundational requirements apply to expert testimony. *See United States v. Banks,* 36 MJ 150, 161 (CMA 1992) (Expert testimony must be "based on a sufficient factual basis to make it relevant."). Furthermore, because of the enhanced weight of expert testimony, its erroneous admission has a higher potential for prejudice.

Notwithstanding my conclusions that the military judge erred and that defense counsel preserved the issue, I join in affirming the decision of the court below. I am satisfied that the convening authority's action, reducing the adjudged confinement from 45 years to 25 years, was sufficient to cure any error in admitting LTC Evans' testimony about appellant's potential for rehabilitation.

---

* Even if appellant's earlier objections were sufficient to permit review of this case for harmless error, we would resolve this issue against him for the reasons stated above. *See* Article 59(a), UCMJ, 10 USC § 859(a).